Betty **LESTER**, Plaintiff-Appellant,

v.

**CITY OF CHICAGO**, Officer Daniel Leahy, Officer Ernest Cain, and Sergeant John McNulty, Defendants-Appellees.

No. 86–2008.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 27, 1987.

Decided Sept. 17, 1987.

Kenneth N. Flaxman, Kenneth N. Flaxman, P.C., Chicago, Ill., for plaintiff-appellant.

Joseph A. Moore, Corp. Counsel, Chicago, Ill., for defendants-appellees.

Before POSNER, FLAUM and MANION, Circuit Judges.

MANION, Circuit Judge.

Betty Lester sued Daniel Leahy and Ernest Cain, two Chicago police officers, under 42 U.S.C. § 1983.[1] Mrs. Lester's complaint arose from her arrest for disorderly conduct at a Chicago police station in May, 1979. Mrs. Lester alleged that Leahy and Cain arrested her without probable cause and that Leahy and Cain used excessive force in arresting her. A jury found for Leahy and Cain on both the no probable cause and excessive force claims.

On appeal, Mrs. Lester contends that the trial court improperly instructed the jury on both her excessive force and no probable cause to arrest claims. Mrs. Lester also contends that insufficient evidence existed for the jury to find that Leahy and Cain had probable cause to arrest her. We affirm the jury's verdict on the no probable cause to arrest claim. However, we reverse and remand for a new trial on Mrs. Lester's excessive force claim.

---

1. 42 U.S.C. § 1983 provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding. . . .
Mrs. Lester also asserted claims against Leahy and Cain under 42 U.S.C. §§ 1981 and 1985(3) and claims against the City of Chicago and Sergeant John McNulty under §§ 1981 and 1985(3). The only claims at issue in this appeal are the § 1983 claims against Leahy and Cain.

## I.

In the late afternoon on May 25, 1979, Mrs. Lester received a telephone call from her father, Alfred Harmon. Mr. Harmon told Mrs. Lester he had been arrested and asked her to come to the Sixth District police station in Chicago to get him out. Mrs. Lester drove to the Sixth District station, arriving sometime between 5:00 and 6:00 p.m. At trial, the evidence revealed conflicting stories about what happened after Mrs. Lester arrived at the Sixth District station.

Mrs. Lester claims the facts were as follows. When she arrived at the Sixth District station one of the three officers at the front desk in the lobby, Sergeant Collins, told her to wait her turn to talk to the officers. Mrs. Lester waited, and then politely inquired about her father. Another officer at the desk, Sergeant Graffis, informed Mrs. Lester that the police did have her father in custody. Mrs. Lester inquired about the charge, and Sergeant Graffis informed her to ask the judge who signed the arrest warrant. The officers at the desk began to look at each other and smile.

According to Mrs. Lester, Sergeant Graffis' response to her inquiry about the charges against her father, and all the officers' behavior "shocked" and "amazed" her. Mrs. Lester, feeling the officers would not have treated her the same way if she were not black, told the officers, "You are white, prejudiced police officers." The officers stopped smiling, and someone (either Leahy or Cain) behind Mrs. Lester said, "Lady, if you don't shut up, we will arrest you." Mrs. Lester again began to speak to the officers at the front desk. Leahy and Cain grabbed Mrs. Lester and told her she was under arrest.

Mrs. Lester testified that after grabbing her, Leahy and Cain dragged her along the floor to the tactical office in the back of the station. Upon arriving at the tactical office, Leahy balled up his fist and drew back his arm as if to hit Mrs. Lester. Mrs.

Lester did not recall if Leahy actually hit her. However, Mrs. Lester did state that Leahy kneed her in the back and handcuffed her tightly. Cain then obtained another pair of handcuffs. To secure Mrs. Lester, he fastened one end of those handcuffs to the handcuffs Leahy had already placed on Mrs. Lester, and fastened the other end of the handcuffs to a radiator in the tactical office.

Leahy's and Cain's evidence revealed a significantly different course of events. Leahy and Cain testified that they saw and heard Mrs. Lester shouting at the officers at the front desk, disrupting the activities at the police station. Leahy saw Mrs. Lester push other people out of her way to get to the front desk.[2] Other civilians in the area shied away from and wanted nothing to do with Mrs. Lester and her antics. According to Cain, "It didn't seem to me that anything was getting done other than Mrs. Lester hollering and screaming at the desk men." After Mrs. Lester ignored repeated warnings by various officers to calm down or face arrest, Leahy and Cain arrested her.

After Leahy and Cain told Mrs. Lester she was under arrest, she ran from them and grabbed onto a pole near the front desk. Leahy, Cain, and other officers pried her hands from the pole and Leahy and Cain walked her toward a door leading to a hallway that led to the back of the station. Mrs. Lester broke from Leahy and Cain and grabbed hold of the doorjamb. Leahy and Cain freed Mrs. Lester from the doorjamb and continued walking her down the hallway toward the tactical office. Mrs. Lester refused to walk under her own power down the hallway, despite Leahy's and Cain's requests and their efforts to support her.

After arriving at the tactical office, Cain handcuffed Mrs. Lester, who was struggling the entire time. After Cain handcuffed Mrs. Lester, she began jumping around and kicking chairs and tables. Because he feared Mrs. Lester might injure

---

**2.** Cain did not testify that he saw Mrs. Lester actually push anybody out of her way. Sergeant Graffis was the only other officer to testi-

fy that he saw Mrs. Lester push anybody out of her way.

herself if not further restrained, Cain obtained another pair of handcuffs and used them to secure Mrs. Lester to the radiator. Both Leahy and Cain denied ever hitting, kicking, or kneeing Mrs. Lester. Leahy and Cain also denied drawing back their fists as if to hit Mrs. Lester.

Mrs. Lester claimed that she suffered bruises to the back of her leg when Leahy and Cain dragged her down the hallway. She also claimed that the tight handcuffs scratched and bruised her wrists. Mrs. Lester stated that she was sore for two weeks after her arrest.

## II.

### A.

Mrs. Lester contends the district court improperly instructed the jury on her excessive force claim. The district court gave three instructions on excessive force:

A person can be subject to an unlawful seizure under the Fourth Amendment if he or she is subjected to "unreasonable force," as that phrase is defined in these instructions, while being arrested by a law enforcement officer, even if such arrest has been based upon "probable cause." (Transcript 334.)

A police officer has the right to use such force as is reasonably necessary under the circumstances to effect an arrest. Whether or not the force used in making an arrest was "unreasonable" is to be determined in the light of all the surrounding circumstances, on the basis of that degree of force a reasonable and prudent person would have applied in effecting the arrest under the circumstances of this case. (Transcript 337–38.)

Before you may determine that any force used by Officers Cain and Leahy was "excessive" as that term is used in these instructions in relation to law enforcement, you must find that: One, there were severe injuries; two, that the

force used was grossly disproportionate to the need for force under the circumstances; and three, that such gross disproportion was the consequence of something other than mere carelessness or unwise excess of zeal so that it amounted to an abuse of official power that "shocks the conscience." (Transcript 337.)

Mrs. Lester challenges only the third quoted instruction. The district court took the language in that instruction almost verbatim from *Gumz v. Morrissette*, 772 F.2d 1395, 1400 (7th Cir.1985), *cert. denied*, 475 U.S. 1123, 106 S.Ct. 1644, 90 L.Ed.2d 189 (1986). (We will refer to this instruction as the "*Gumz* instruction.") In *Gumz*, the majority [3] employed a Fourteenth Amendment substantive due process analysis to analyze an excessive force in arrest claim.[4] The *Gumz* majority held that a state officer's use of force is unconstitutional if it "1) caused severe injuries, 2) was grossly disproportionate to the need for action under the circumstances, and 3) was inspired by malice rather than merely careless or unwise excess of zeal so that it amounted to an abuse of official power that shocks the conscience." *Id.; see also Bailey v. Andrews*, 811 F.2d 366, 373 (7th Cir.1987).

■ Mrs. Lester contends that she based her excessive force claim solely on a Fourth Amendment theory. Generally, under the Fourth Amendment, an officer's use of force is unconstitutional if the force used is unreasonable under the circumstances.[5] *See Bell v. Milwaukee*, 746 F.2d 1205, 1278–79 & n. 88 (7th Cir.1984). According to Mrs. Lester, the *Gumz* majority explicitly distinguished between excessive force in arrest claims brought under a Fourth Amendment theory and those brought under a Fourteenth Amendment substantive due process theory. Since *Gumz* addressed only a claim brought under a Fourteenth Amendment substantive due process theory, Mrs. Lester reasons,

---

**3.** Judge Easterbrook concurred in the panel's judgment on the excessive force claim, but not in the opinion.

**4.** In *Gumz*, the plaintiff alleged that the Wisconsin Department of Natural Resources had used

excessive force in arresting him by using too many wardens in an unnecessary show of force.

**5.** *See* Section II.B, *infra*, for a further discussion of the Fourth Amendment analysis.

the *Gumz* criteria apply only to Fourteenth Amendment excessive force claims, not Fourth Amendment excessive force claims. Mrs. Lester contends that since she brought no Fourteenth Amendment excessive force claim, the district court erred in giving the *Gumz* instruction. See *Feemster v. Dehntjer*, 661 F.2d 87 (8th Cir.1981) (holding that it was error for trial court to instruct the jury on an issue relating to a theory of liability plaintiff abandoned during trial).

We agree with Mrs. Lester that the *Gumz* majority distinguished between Fourth and Fourteenth Amendment excessive force in arrest claims and that the *Gumz* majority addressed only what the plaintiff had labeled a Fourteenth Amendment claim. Although the *Gumz* majority recognized that Fourth Amendment analysis of excessive force in arrest claims was proper, *Gumz*, 772 F.2d at 1399–1400 n. 3, the plaintiff in *Gumz* couched his excessive force claim solely in Fourth Amendment terms on appeal. Therefore, the *Gumz* majority held that no Fourth Amendment claim was before it, and analyzed the plaintiff's excessive force claim only under a Fourteenth Amendment substantive due process standard. *Id.*

Although we agree with Mrs. Lester's analysis of *Gumz*, we find it unclear from the record whether Mrs. Lester based her excessive force claim solely on the Fourth Amendment. One could read Mrs. Lester's complaint as advancing both Fourth and Fourteenth Amendment excessive force theories. The record is also unclear about whether or not Mrs. Lester advanced a Fourteenth Amendment excessive force theory at trial. However, Leahy and Cain do not challenge Mrs. Lester's assertion that she advanced only a Fourth Amendment excessive force theory; instead, they argue that the same standards govern all excessive force claims brought in this circuit, and that the *Gumz* criteria properly articulate those standards.

We need not decide how Mrs. Lester actually chose to label her excessive force claim. We agree with Leahy and Cain that all excessive force in arrest claims should be analyzed under the same standard. However, we conclude that the proper standard for analyzing excessive force in arrest claims is a Fourth Amendment standard, and not a Fourteenth Amendment substantive due process standard.

## B.

Unlike the Fourteenth Amendment, "the Fourth Amendment is specifically directed to methods of arrest and seizure of the person." *Bell*, 746 F.2d at 1278 n. 87 (7th Cir.1984) (citing *Garner v. Memphis Police Dept.*, 710 F.2d 240, 243 (6th Cir. 1983), *aff'd sub. nom., Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). Mrs. Lester complains that Leahy and Cain used more force than was necessary to arrest her. Mrs. Lester's claim is quintessentially a Fourth Amendment claim. She is really complaining that Leahy and Cain violated her "right ... to be secure in [her] person[ ] ... against unreasonable ... seizure[ ]." U.S. Const. Amend. IV. Since the Fourth Amendment is specifically directed to Mrs. Lester's complaint, no need exists to go beyond the Fourth Amendment to address her claim.

The substantive due process "shocks the conscience" standard on which the *Gumz* criteria are based originated in *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). In *Rochin*, the Supreme Court held that forcing an emetic down a suspect's throat to induce vomiting to obtain evidence from the suspect violated the suspect's right to due process of law. *Id.* at 166, 172–74, 72 S.Ct. at 206, 209–10. The *Rochin* Court found that the police's conduct "shock[ed] the conscience" and was "bound to offend even hardened sensibilities." *Id.* at 172, 72 S.Ct. at 210.

At the time the Court decided *Rochin*, the Court had not yet held that the Fourth Amendment's exclusionary rule applied to the states. *See Wolf v. Colorado*, 338 U.S. 25, 28–33, 69 S.Ct. 1359, 1361–64, 93 L.Ed. 1782 (1949) (holding that exclusionary rule did not apply to the states). *See also* Comment, *Excessive Force Claims: Removing the Double Standard*, 53 U.Chi.L.Rev. 1369, 1379 (1986). Thus, the *Rochin* Court

used the "shocks the conscience" standard to exclude the evidence obtained by pumping the suspect's stomach. Subsequent to *Rochin*, the Supreme Court reversed itself, and applied the Fourth Amendment exclusionary rule to the states. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Consequently, the Court has not relied on the *Rochin* "shocks the conscience" standard but has instead applied a Fourth Amendment reasonableness analysis in cases that, like *Rochin*, involved highly intrusive searches or seizures. In *Schmerber v. California*, 384 U.S. 757, 766–72, 86 S.Ct. 1826, 1833–36, 16 L.Ed.2d 908 (1966), the Court held that admitting evidence obtained from a warrantless blood test in a drunk driving trial did not violate the Fourth Amendment. In *Winston v. Lee*, 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985), the Court used a Fourth Amendment analysis to hold that a state could not compel a suspect to undergo surgery under a general anesthetic to remove a bullet that could provide evidence of the suspect's guilt or innocence. And in *United States v. Montoya de Hernandez*, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985), the Court used a Fourth Amendment analysis to uphold the lengthy detention of a drug smuggler so that officials could examine her feces for drugs.

The Court's shift from a substantive due process "shocks the conscience" standard to an objective Fourth Amendment analysis in these cases is most pronounced in *Lee* and *Montoya*. In *Lee*, the Court mentioned *Rochin* only in passing, in a footnote. See *Lee*, 470 U.S. at 762 n. 5, 105 S.Ct. at 1617 n. 5. In *Montoya*, the Court did not even mention *Rochin*. *Schmerber*, *Lee*, and *Montoya* all suggest that the Supreme Court today would not employ a "shocks the conscience" test in *Rochin* but would decide the case on Fourth Amendment grounds. See Comment, *supra*, 53 U.Chi.L.Rev. at 1378–79.

In the only case in which the Supreme Court has held that police used excessive force in an arrest, the Court employed Fourth Amendment analysis. *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). In *Garner*, the Court held that using deadly force to apprehend a suspect is unreasonable, absent probable cause that the suspect is dangerous or has committed a violent crime. *Id.* at 11, 105 S.Ct. at 1701. The Court stated that "[w]henever an officer restrains the freedom of a person to walk away, he has seized that person." *Id.* at 7, 105 S.Ct. at 1699. A seizure's reasonableness depends not only on when an officer seizes a person but also on *how* the officer seizes the person. *Id.* at 7–8, 105 S.Ct. at 1699–1700.

Determining whether a police officer has unreasonably seized a person by using excessive force involves balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* at 8, 105 S.Ct. at 1699; see also *Kidd v. O'Neil*, 774 F.2d 1252, 1256 (4th Cir.1985); *Gilmere v. City of Atlanta*, 774 F.2d 1495, 1502 (11th Cir.1985) (en banc), *cert. denied*, —— U.S. —— & ——, 106 S.Ct. 1970 & 1993, 90 L.Ed.2d 654 & 673 (1986). This balancing of interests in any given case depends on "whether the totality of circumstances justifies a particular sort of ... seizure." *Garner*, 471 U.S. at 8–9, 105 S.Ct. at 1700; see *Gilmere*, 774 F.2d at 1502 (among factors to consider are "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted"). Thus, the Fourth Amendment test measures a seizure's objective reasonableness under the circumstances. Although the issue in *Garner* was deadly force, implicit in its totality of circumstances approach is that police use of less than deadly force would violate the Fourth Amendment if not justified under the circumstances. See *Kidd*, 774 F.2d at 1256–57. Thus, *Garner's* Fourth Amendment analysis applies to all excessive force in arrest claims, not just claims that police used deadly force.

As shown above, the Supreme Court has relied upon Fourth Amendment analysis rather than the *Rochin* substantive due process "shocks the conscience" standard in cases that, like *Rochin*, involved highly intrusive searches and seizures. Further-

more, the Court used Fourth Amendment analysis in *Garner*, the only case in which the Court has held that police used excessive force in an arrest. These facts strongly suggest, if not compel, the conclusion that the Fourth Amendment, not substantive due process, provides the proper analysis in excessive force in arrest claims. This is especially so, given that the Fourth Amendment, unlike the Fourteenth Amendment, is specifically directed to unreasonable seizures. Therefore, we hold that the *Gumz* criteria, which derive from substantive due process, do not govern excessive force in arrest claims. Instead, the Fourth Amendment objective reasonableness standard applies.

### C.

One might argue, as Leahy and Cain have, that the *Gumz* criteria merely make clear that "not every injury involving a state official sets forth a constitutional claim" and that "not every assault and battery by a police officer is actionable under Section 1983." (Appellees' Br. 30–31.) According to Leahy and Cain, the *Gumz* test for excessive force incorporates the same balancing of interests the Supreme Court undertook in *Garner*. Thus, the *Gumz* test is merely another way of stating *Garner's* Fourth Amendment analysis. *See Jamieson v. Shaw*, 772 F.2d 1205, 1210 (5th Cir.1985) (stating that the Fifth Circuit's three-part test for excessive force, which is identical to the *Gumz* test, is similar to the analysis the Supreme Court employed in *Garner*). Therefore, argue Leahy and Cain, although excessive force in arrest claims implicate essentially Fourth Amendment interests, the *Gumz* criteria represent the proper approach to analyzing those claims.

We disagree with this argument for several reasons. First, this argument ignores *Gumz* itself. In *Gumz* the court distinguished between Fourth and Fourteenth Amendment excessive force in arrest claims. If the *Gumz* court had intended the standards it adopted to govern all excessive force in arrest claims, it would not have needed to distinguish between Fourth and Fourteenth Amendment claims.

■ Second, the *Gumz* criteria require a subjective inquiry into a police officer's motives to determine if he acted with "malice" and his actions, therefore, "shock the conscience." This subjective inquiry into motive is incompatible with a Fourth Amendment standard that calls for objective analysis without regard to the officer's underlying intent or motivation. *See Scott v. United States*, 436 U.S. 128, 137–38, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168. An objectively unreasonable seizure violates the Constitution regardless of an officer's good intent; likewise, an objectively reasonable seizure does not violate the Constitution despite the officer's bad intent. *See id.*

■ Finally, a Fourth Amendment reasonableness analysis is not inconsistent with the admonition that not every injury involving a state official sets forth a constitutional claim. We agree with this general proposition, and we do not mean to imply that every push and shove an officer makes during an arrest will subject the officer to § 1983 liability. The power to arrest necessarily carries with it the power to use some force to make an arrest. Police officers must make quick decisions in the field regarding the appropriate amount of force to use in making an arrest.

However, the Fourth Amendment, by its very terms, sets the constitutional limit on the amount of force an officer may use while making an arrest. The Fourth Amendment protects against unreasonable seizures, not seizures that "shock the conscience" or cause "severe injuries." If, under the totality of circumstances, a police officer unreasonably seizes a person by using excessive force, he has violated that person's Fourth Amendment rights. The objectively unreasonable seizure itself (regardless of the officer's motive or whether any injury inflicted was severe) crosses the constitutional threshold.

Therefore, we reject Leahy's and Cain's argument that the *Gumz* criteria merely restate Fourth Amendment analysis. On the contrary, in several respects, the *Gumz* criteria are incompatible with Fourth

Amendment standards for analyzing excessive force in arrest claims. Having concluded that the Fourth Amendment provides the proper standard, we must reject the *Gumz* criteria in those claims.

### D.

To sum up, an excessive force in arrest claim is quintessentially a Fourth Amendment claim; an officer using excessive force to arrest a person has unreasonably seized that person. Recent Supreme Court precedent strongly suggests that the Fourth Amendment objective reasonableness standard, rather than a substantive due process standard, properly governs excessive force in arrest claims. The *Gumz* criteria, which are substantive due process criteria, are not merely another way of stating the Fourth Amendment reasonableness standard; in fact, *Gumz* is incompatible with a Fourth Amendment objective reasonableness analysis. Given that incompatibility, there should be no occasion to apply substantive due process standards (and, thus, the *Gumz* criteria) to an excessive force in arrest claim.

▇ While with this decision we effectively overrule *Gumz*, we emphasize that we do not do so lightly.[6] *Gumz* is a recent decision, and we have carefully weighed the impact of overruling it. The considerations we have set out above, however, persuade us that this is the proper course to follow. Thus, rather than attempt to distinguish and isolate *Gumz* (and engender the confusion that results from having two inconsistent standards govern the same claims), we hold that Fourth Amendment standards govern all excessive force in arrest claims.[7] Under the Fourth Amendment, a police officer's use of force in arresting a suspect violates the Constitution if, judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest. Because the

**6.** Under Circuit Rule 40(f) this opinion has been circulated among all judges of this Court in active service. A majority did not favor a rehearing *en banc* on the question of overruling *Gumz v. Morrissette*, 772 F.2d 1395 (7th Cir. 1985), certiorari denied, 475 U.S. 1123, 106 S.Ct. 1644, 90 L.Ed.2d 189 (1986). Chief Judge Bauer and Circuit Judges Cummings and Wood voted for such rehearing. They believe *Gumz* was correctly decided and note that its rationale was recently followed by the Eleventh Circuit in *Gilmere v. City of Atlanta*, 774 F.2d 1495, 1499–1502 (1985) (*en banc*), certiorari denied, —— U.S. —— & ——, 106 S.Ct. 1970 and 1993, 90 L.Ed.2d 654 & 673 (1986). In their view there is no need to reexamine *Gumz* in the absence of any Supreme Court authority to the contrary. They also feel that the interaction of excessive force cases with other Fourth Amendment cases involving, for example, the exclusionary rule and "fruit of the poisonous tree" doctrine is uncertain and counsels against sole reliance on the Fourth Amendment rationale to handle cases which may more properly fall within the traditional ambit of due process and its concern with governmental imposition of summary punishment outside of normal procedural channels.

**7.** Throughout this opinion, we have been careful to emphasize that we are dealing with a claim of excessive force *in arrest*. We hold only that Fourth Amendment standards govern excessive force in arrest claims because the Fourth Amendment is specifically directed to those claims. Therefore, we express no view as to the viability of substantive due process other than in excessive force in arrest claims. Likewise, we do not address the proper standard for analyzing claims of excessive force by state officers in other situations, such as pretrial detention. *See, e.g., Johnson v. Glick*, 481 F.2d 1028 (2d Cir.1973) (court analyzed as a violation of substantive due process allegation by pretrial detainee that guard beat him). See generally *Kidd*, 774 F.2d at 1257–61, for a thorough discussion of the similarities and differences between excessive force claims arising out of different factual contexts.

We are aware that the line between arrest and pretrial detention is not always clear. *See* Comment, *Excessive Force Claims: Removing the Double Standard*, 53 U.Chi.L.Rev. 1369, 1388. However, the parties have addressed this as an arrest case. Moreover, we agree, in the context of this case, that "once a seizure has occurred, it continues throughout the time the arrestee is in the company of the arresting officers." *Robins v. Harum*, 773 F.2d 1004, 1010 (9th Cir.1985). In this case, all the acts Mrs. Lester complains about occurred while she was in the company of Leahy and Cain, the arresting officers, and were part of Leahy's and Cain's attempts to finally secure her. When the alleged acts occurred, Mrs. Lester had not been formally charged, and bail had not yet been set. *Cf. Justice v. Dennis*, 793 F.2d 573, 575–76 (4th Cir.1986) (person who had been arrested, had appeared before a magistrate, and had had bail set was a pretrial detainee), *rehearing en banc granted*, 802 F.2d 1486 (4th Cir.1986). Therefore, the acts Mrs. Lester alleged occurred during her arrest.

*Gumz* criteria are incompatible with this Fourth Amendment analysis, the district court erred by giving the *Gumz* instruction.[8]

Giving the *Gumz* instruction was not harmless error. *See* Fed.R.Civ.P. 61. Mrs. Lester testified that she did not resist arrest. Despite her claimed lack of resistance, Mrs. Lester testified that Leahy threatened to hit her with his fist, and that one of the officers kneed her in the back. Besides this, Mrs. Lester also testified that Leahy and Cain dragged her down a hallway when she could have (and would have) walked under her own power, handcuffed her to a radiator, and handcuffed her so tightly that the handcuffs bruised her wrists. If the jury believed all this testimony (and we do not imply that the jury did), it could have concluded that Leahy and Cain used more force than was reasonably necessary under the circumstances. However, the jury might still have found against Mrs. Lester because her injuries were not sufficiently severe, or because Leahy's and Cain's actions, while objectively unreasonable, did not "shock the conscience."

Because giving the *Gumz* instruction was not harmless error, we must reverse and remand for a new trial on Mrs. Lester's excessive force claim.

### III.

■ Mrs. Lester also contends that the district court erred when it denied her motion for judgment notwithstanding the verdict on her no probable cause to arrest claim. According to Mrs. Lester, insufficient evidence existed for the jury to find that Leahy and Cain had probable cause to believe she was committing disorderly conduct. Mrs. Lester further contends that even if the district court properly submitted the probable cause issue to the jury, the court erred by refusing to give Mrs. Lester's proposed instruction defining "breach of the peace."

In reviewing the district court's denial of Mrs. Lester's motion for judgment n.o.v., we must determine if sufficient evidence existed to support the jury's verdict, viewing the evidence and all reasonable inferences that may be drawn from it in the light most favorable to Leahy and Cain. *Bass v. Wallenstein*, 769 F.2d 1173, 1182 (7th Cir.1985). If fair and impartial people could reach different conclusions from the evidence, the district court properly denied the motion for judgment n.o.v. *Id.*

Leahy and Cain arrested Mrs. Lester for disorderly conduct. The Chicago disorderly conduct ordinance states:

A person commits disorderly conduct when he knowingly (a) does any act in such unreasonable manner as to provoke, make, or aid in making a breach of the peace.

Chicago Municipal Code, ch. 193, § 193–1(a).[9] Disorderly conduct has never had a precise definition; the types of conduct that may be disorderly conduct "almost defy definition." *People v. Davis*, 82 Ill.2d 534, 45 Ill.Dec. 935, 937, 413 N.E.2d 413, 415 (1980); *United States v. Woodard*, 376 F.2d 136, 140 n. 4 (7th Cir.1967). *See generally* Ill.Ann.Stat. ch. 38, para. 26–1, Committee Comments, at 149–50 (Smith-Hurd 1970). Therefore, whether particular conduct is disorderly conduct depends not only on the conduct itself but also on the conduct's unreasonableness in relation to the surrounding circumstances. *Davis*, 45 Ill.Dec. at 937, 413 N.E.2d at 415; *Chicago v. Morris*, 47 Ill.2d 226, 264 N.E.2d 1, 3 (1970); *Terket v. Lund*, 623 F.2d 29, 31 (7th Cir.1980); *Woodard*, 376 F.2d at 139. In

---

8. The other two excessive force instructions the district court gave, which we have quoted in this opinion, are examples of instructions that properly state the Fourth Amendment objective reasonableness standard.

9. A similar Illinois statute states:
    (a) A person commits disorderly conduct when he knowingly

(1) does any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace.
Ill.Ann.Stat., ch. 38, para. 26–1(a)(1) (Smith-Hurd Supp. 1987). Illinois courts have treated the Chicago ordinance and the Illinois statutes alike. *See, e.g., Morris*, 264 N.E.2d at 3.

short, conduct that is not disorderly in one place may be disorderly in another.

The jury could find that Leahy and Cain had probable cause to arrest Mrs. Lester if sufficient evidence existed to show that the facts and circumstances within Leahy's and Cain's knowledge would lead a reasonable police officer to believe that Mrs. Lester was committing disorderly conduct. *See Williams v. Kobel,* 789 F.2d 463, 470–71 (7th Cir.1986). The record in this case, viewed in the light most favorable to Leahy and Cain, shows that Leahy and Cain both observed Mrs. Lester loudly and abusively arguing with other police officers and disrupting the normal activities at the station. According to Cain, officers at the front desk were unable to serve other civilians at the station, and "[i]t didn't seem like anything was getting done other than Mrs. Lester hollering and screaming at the desk men." Furthermore, Leahy saw Mrs. Lester push people out of her way to get to the front desk, and Cain observed that other civilians at the station shied away from and wanted nothing to do with Mrs. Lester.

Mrs. Lester contends that the evidence shows her conduct amounted to no more than a loud, possibly offensive argument with police officers; according to Mrs. Lester, loud, offensive argument with police officers is not disorderly conduct in Illinois. *See People v. Justus,* 57 Ill.App.3d 164, 14 Ill.Dec. 836, 372 N.E.2d 1115 (1978). However, the facts in the record, particularly Leahy's testimony that Mrs. Lester pushed other civilians, show that the jury could have reasonably believed that Mrs. Lester's conduct was more than an argument with the officers at the station.

■ Even discounting Leahy's observation that Mrs. Lester pushed other civilians, we conclude that sufficient evidence existed for the jury to find that Leahy and Cain had probable cause to arrest Mrs. Lester. Arguing with a police officer, even

in a loud, offensive manner, may not, by itself, constitute disorderly conduct under Illinois law. But that does not mean that arguing with a police officer may never be disorderly conduct. Arguing with police officers can be disorderly conduct in Illinois, depending on the argument's circumstances and its tendency to create public disorder. *See Morris,* 264 N.E.2d 1; *Chicago v. Robinson,* 32 Ill.App.3d 149, 336 N.E.2d 158 (1975), *appeal dismissed,* 426 U.S. 915, 96 S.Ct. 2619, 49 L.Ed.2d 369 (1976); *see also Justus,* 372 N.E.2d at 1117 (while reversing a disorderly conduct conviction, the court stated, "while arguing with a police officer is one factor to be considered, culpability is also dependent on the surrounding circumstances"). Here, Mrs. Lester's loud, offensive argument occurred at a police station, with other civilians present, and disrupted the station's normal activities. The jury could find that Mrs. Lester's "argument" was unreasonable under the circumstances and tended to cause public disorder. Mrs. Lester cites no authority holding that such conduct cannot be disorderly conduct; we find nothing in Illinois law that eviscerates a police officer's authority so much that he cannot maintain order in his own station. Sufficient evidence existed for the jury to find that Leahy and Cain had probable cause to arrest Mrs. Lester for disorderly conduct. *Compare Woodard,* 376 F.2d at 139–40 (upholding disorderly conduct *convictions* resulting from standing up and shouting at a House Committee meeting and falling limp upon being refused re-entry into the meeting).

■ Mrs. Lester also contends that even if sufficient evidence existed to send the probable cause issue to the jury, we must still reverse because the district court refused to give Mrs. Lester's proposed instruction defining "breach of the peace." [10] The district court instructed the jury on

---

**10.** Mrs. Lester proposed the following instruction:

Under Illinois law, the use of vulgar or abusive language does not by itself amount to a "breach of the peace." Nor does the use of vulgar or abusive language amount to a "breach of the peace" merely if people stand-

ing nearby stop, look, and listen. In addition, arguing with a police officer, even in an insolent manner, does not by itself, amount of [sic] a breach of the peace. Finally, it is not a "breach of the peace" to speak words offensive to some who hear them.

disorderly conduct by reading the Chicago disorderly conduct ordinance. The district court refused to give any further instruction concerning disorderly conduct or breach of the peace. According to Mrs. Lester, the district court's failure to further define breach of the peace "effectively licensed the jury to create its own standard," and allowed the jury to find for Leahy and Cain even if it believed that Mrs. Lester's conduct amounted to no more than mere argument or offensive language.

We disagree. The district court's disorderly conduct instruction accurately stated Illinois law—in fact, it was Illinois law. The instruction informed the jury that to commit disorderly conduct, a person must knowingly commit an unreasonable act so as to provoke, make, or aid in making a breach of the peace. The act requirement indicated that more than mere speech was required for disorderly conduct. The unreasonableness requirement implicitly told the jury that it must examine Mrs. Lester's acts in the context of surrounding circumstances. Finally, while breach of the peace is not the most precise term in the law, the breach of the peace requirement did instruct the jury that besides being unreasonable, Mrs. Lester's conduct had to cause a public disturbance.

The jury could properly find for Leahy and Cain even if Mrs. Lester's actions amounted only to a loud, offensive argument with the officers at the station if the argument was unreasonable under the circumstances and tended to cause a public disturbance. The disorderly conduct instruction the district court gave adequately and correctly instructed the jury on the law it needed to know to determine whether Leahy and Cain had probable cause to arrest Mrs. Lester.

### IV.

For the reasons set out in this opinion, we affirm the jury's verdict on Mrs. Lester's no probable cause to arrest claim. We reverse and remand for a new trial on Mrs. Lester's excessive force claim.

AFFIRMED IN PART; REVERSED IN PART AND REMANDED.