**John E. FRIGO, Plaintiff,**

v.

**Sgt. Frank GUERRA, et al., Defendants.**

**No. 92 C 7161.**

United States District Court,
N.D. Illinois,
Eastern Division.

July 12, 1994.

Barbara J. Clinite, Chicago, IL, for plaintiff.

Thomas L. Ciecko, Asst. Atty. Gen., Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

John Frigo ("Frigo") has sued Illinois State Police Sergeants Frank Guerra ("Guerra") and Mark Stevens ("Stevens") under 42 U.S.C. § 1983 ("Section 1983"). Frigo charges them with two violations of his Fourth Amendment[1] rights to be free from unreasonable seizure, one by having arrested him without probable cause and the other by having subjected him to excessive force in the course of that arrest. Guerra and Stevens have moved under Fed.R.Civ.P. ("Rule") 56 for summary judgment, and their motion is fully briefed and ready for decision.[2] For the reasons stated in this memorandum opinion and order, Guerra's motion is granted while Stevens' is granted in part and denied in part.

### Facts

Guerra and Stevens work undercover. Stevens, a Master Sergeant, is Guerra's supervisor.

In June 1992 Guerra set up a reverse drug sting under which he agreed to sell five kilograms of cocaine to Alfredo Nevarez a/k/a Tony Garcia ("Nevarez"). On the morning of June 27 Nevarez phoned Guerra, who gave him directions to a K-mart parking lot off of Route 30 near I–80 in New Lennox, Illinois, where the deal was supposed to go down. Nevarez told Guerra that he would be travelling in a beige Thunderbird and that he planned to show up accompanied by other individuals.

As supervisor of Guerra's squad Stevens was in charge of surveillance and positioning other officers during the course of the operation. He waited in civilian clothing in an unmarked blue Thunderbird parked in the southeast corner of the parking lot, from which vantage point he eventually observed a white Chevrolet and Frigo's pewter-colored (dull silver) Thunderbird turn into the lot and stop near some dumpsters.

Next Stevens saw three individuals get out of the two cars, one of whom (Nevarez) then walked over and entered Guerra's black Firebird. After that brief encounter, Stevens watched Nevarez return to the Chevrolet and leave the area via Route 30, followed by the Thunderbird. Though Stevens could no longer see the vehicles himself, he learned of developments via radio from other officers stationed all around the area: Guerra had agreed to reconvene at a nearby Speedway gas station per Nevarez' request, and Stevens was continuously apprised of the parties' whereabouts.

Upon arriving at the Speedway station, Guerra observed the Thunderbird pulling out. Then Guerra met with Nevarez and drove him a short distance to the parking lot of an Eagle food store to meet Guerra's

---

1. As always, this opinion adheres to the conventional and convenient (though technically imprecise) practice of referring to the Fourth Amendment's underlying Bill of Rights provision (which of course imposes limitations only on the federal government) rather than to the Fourteenth Amendment (which applies to state actors and has been construed to embody such Bill of Rights guaranties).

2. Familiar Rule 56 principles impose on movants Guerra and Stevens the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to nonmovant Frigo (*Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991) and cases cited there).

partner (Agent Juan DeLeon) and inspect the drugs. Apparently satisfied, Nevarez returned on foot to his Chevrolet to get the purchase money, which he and his companion Francisco Unzueta ("Unzueta") then drove over and displayed to Guerra in a blue gym bag, a bag Stevens later testified that he was advised had come from Frigo's Thunderbird.

Because that money-for-drugs showing supported an arrest, a signal was given and Nevarez and Unzueta were taken into custody. Closer inspection of the gym bag revealed that it also contained a gun. Upon learning that the third individual was being pursued, Guerra immediately transmitted a radio broadcast warning all surveillance personnel that the suspect might be armed.

■ Frigo's account of those events varies from that of the law enforcement agents in several key respects.[3] Frigo testified that on the day in question he picked up his friend Unzueta and had agreed to follow one of Unzueta's buddies to drop off a car in Joliet. After the two cars stopped for gas, Unzueta went over to speak with the driver of the Chevrolet and then assertedly told Frigo he was going to stay with his buddy. Having no other business in New Lennox, Frigo set out for home.[4]

Before he did so, however, Frigo pulled out of the Speedway station and onto the westbound shoulder of Route 30 (Frigo Dep. 108–09). Though he lived to the east, Frigo explained that he was parked there because he wanted to pick up one of his cassette tapes from the floor before he turned around and headed back (id. 109). When he looked up, Frigo said, he was startled to discover a man in a car pulled up alongside him and pointing a gun at him (id.). Frigo took off down the shoulder and a chase ensued toward I–80. At one point when traffic became too heavy Frigo and his pursuer left the

highway by way of an entrance ramp (id. 120–21). Later Frigo (at that point he was followed by two cars) U-turned across a grassy median (id. 124–27), after which he finally stopped and left the Thunderbird. At that point, Frigo said, he was hit in the face, tackled and kicked before being arrested and handcuffed.

To return to Stevens' story, he says that he observed Frigo leave the Speedway station and park about 150 feet away facing west on Route 30, so that Frigo was in a position to observe whatever transaction took place between the other men. Just as Stevens heard the arrest signal indicating that the bust had been completed, he saw Frigo accelerate westward at a high rate of speed. Stevens took off in pursuit, claiming that his car had its "wig-wag" lights flashing and siren blaring (as stated later, Frigo denies that—and this opinion must credit Frigo's version). Stevens testified that when the cars eventually came to a halt on the side of the road, Special Agents Kevin Lane ("Lane") and Wayne Struska ("Struska") approached Frigo's Thunderbird, announced their office and advised him to leave his vehicle. Instead Frigo slammed his car into reverse, backing into Stevens' recently-vacated squad car.

According to Stevens, after a brief struggle Lane and Struska removed Frigo from his car and subdued him face down on the ground while Stevens, with some difficulty, eventually succeeded in handcuffing him. At no point, Stevens contends, did any of the officers strike Frigo's body (but this opinion must credit Frigo's contrary version in that respect). Stevens relates that when he asked Frigo why he had fled, Frigo told him that "he'd been arrested before and didn't want to go back to jail" (Stevens Dep. 65)—another statement that Frigo denies and that

---

**3.** Just a few words should be added here about factual disputes and the inference-drawing process referred to in n. 2. For present purposes this Court is required to accept Frigo's version rather than that of the officers. But when it comes to what the officers *knew* or reasonably *believed* at the time of Frigo's arrest—the critical factors for the probable cause determination that (as later explained) measures the reasonableness of that Fourth Amendment seizure—Frigo's ver-

sion is relevant only if and to the extent that it may create inferences negating the officers' own testimony on that score.

**4.** Frigo Dep. 104:

Q: Did you say something like: What the hell did you drag me all the way to Joliet [sic] for?

A: No. I just left.

is accordingly discredited on the current motion.

Frigo's Section 1983 action claims that he suffered permanent injuries to his face and head. He sues Guerra and Stevens for $150,000 each in compensatory damages and another $200,000 each in punitive and exemplary damages.

### Invocation of Fourth Amendment Principles

■ Chief Justice Rehnquist's plurality opinion in *Albright v. Oliver,* —— U.S. ——, ——–——, 114 S.Ct. 807, 811–12, 127 L.Ed.2d 114 (1994) provides a succinct statement of the province of Section 1983 and the initial 2, 3, 5, 6, 7, 9 methodology for calling it into play:

> Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan,* 443 U.S. 137, 144, n. 3 [99 S.Ct. 2689, 2695, n. 3, 61 L.Ed.2d 433] (1979). The first step in any such claim is to identify the specific constitutional right allegedly infringed. *Graham v. Connor,* 490 U.S. 386, 394 [109 S.Ct. 1865, 1870, 104 L.Ed.2d 443] (1989); and *Baker v. McCollan, supra,* 443 U.S., at 140 [99 S.Ct., at 2692].

And *Graham,* 490 U.S. at 394, 109 S.Ct. at 1870 goes on to teach:

> The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right. . . .

■ In contending that his Fourth Amendment rights have been violated, Frigo has invoked the correct legal source in support of his claims: In constitutional terms an arrest is of course a "seizure" (judged, as discussed later, by whether a reasonable officer would find probable cause for the arrest), and *Graham, id.* at 395, 109 S.Ct. at 1871 further teaches that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive

due process' approach." This opinion examines each of Frigo's claims through the relevant lens of reasonableness.

### Guerra's Non–Liability

■ Because the issue can be disposed of quickly, this opinion first addresses Frigo's claim that Guerra can be held accountable for whatever—either the arrest itself or the use of force—occurred post-chase on the side of the road. No basis exists for that claim.

Frigo's Amended Complaint ("Complaint") ¶¶ 25–27 allege:

> 25. Defendant SGT. FRANK GUERRA, was in charge of the assignment being performed by SGT. M. STEVENS, and at the time the Plaintiff was first sitting in his car, did direct the Defendant, SGT. M. STEVENS by radio to carry out said acts against the Plaintiff, including the assault, pursuit and beating.
>
> 26. SGT. FRANK GUERRA, did remain in constant radio contact with SGT. M. STEVENS during said pursuit and did approve the actions of SGT. M. STEVENS.
>
> 27. Although the defendant, SGT. FRANK GUERRA, knew that there was no evidence of any crime committed by the Plaintiff, and knew that SGT. M. STEVENS was not in uniform and was using an unmarked car, he did authorize and specifically direct the Defendant, SGT. M. STEVENS to assault, pursue and seize the Plaintiff.

But Rule 56(e) specifies that on a motion for summary judgment a party's ability to rely on any unadmitted allegations of his or her complaint vanishes—instead the party must tender admissible evidence.

In response to Guerra's statement that he had no communication with Stevens from the time that the arrest signal was given until Frigo had been taken to jail (Guerra Dep. 48–49), Frigo offers only his own assertion that the two officers maintained radio contact (Frigo Dep. 87–88). Asked about the basis for that testimony, Frigo alluded to some police reports (*id.*)—but those reports were never provided to this Court. That alone entitles this Court to reject Frigo's version

as without any predicate in the evidence. But even were that not so, it is not germane whether the two men spoke back and forth anyway, because Guerra took his orders from Stevens and not the other way around. Stevens was Guerra's supervisor and as such was the one in charge of the operation (P. 12(n) ¶5[5] admits that; and Guerra Dep. 35 expressly said, "Mark Stevens, he's in charge of what's happening out there.... It's his job to specify for certain agents to arrest certain individuals, others to do this and so forth").

Thus Frigo's Mem. 17 assertion that "[e]ven though he [Guerra] had no facts upon which to base probable cause, he gave Stevens the signal to arrest Frigo" is totally without foundation.[6] Guerra Dep. 35 states unequivocally that once he gave the arrest signal, "I was out of the picture. I just sat in my car and watched. Safer." And when Frigo was questioned about how he knew that Guerra "directed" Stevens to "assault, pursue and seize" him, Frigo answered flatly "I don't" without any further explanation (Frigo Dep. 164–65).[7]

*Stevens' Probable Cause To Arrest Frigo*

■ As for Frigo's initial Fourth Amendment claim against Stevens—that Frigo's arrest was an unreasonable seizure—Frigo must provide a reasonable factual predicate for a finding that Stevens acted without probable cause. As our Court of Appeals recently explained in *United States v. Evans,* 27 F.3d 1219, 1228 (7th Cir.1994):

> Probable cause exists if under the totality of circumstances it was reasonable for the officer to believe that a particular individual had committed a crime.

In terms of what Stevens understood to be the situation at the time of the chase (even with all reasonable inferences drawn in Frigo's favor), he readily passes that test. First and foremost, Stevens was told that Unzueta took the gym bag (which turned out to be full of drug money) from Frigo's Thunderbird (Stevens Dep. 36–39, 46). Frigo's insistence that he did not know the contents of the bag (Frigo Dep. 107) or Unzueta's and Nevarez' intentions (*id.* 95–96) is obviously not pertinent to whether Stevens had reason to believe Frigo's complicity in the drug deal.[8] Moreover, Frigo concedes that he was parked on the west shoulder of Route 30 in full view of the Speedway station at the exact time the money was to be exchanged for the drugs. Regardless of his own explanation for his position, Frigo cannot even suggest why *Stevens* would not be reasonable in assuming that Frigo was connected to the events about to unfold.

Those circumstances, coupled with Unzueta's prior statement to Guerra that he would not be working alone but would be accompanied by others, provided Stevens with ample probable cause to believe that Frigo was a participant in the commission of the crime.

---

5. This District Court's General Rule ("GR") 12(m) facilitates the resolution of Rule 56 motions by requiring all movants to submit statements of assertedly uncontested facts with citations to the record in support of each, to which GR 12(n) requires all nonmovants to respond point by point, with citations to the record in support of (1) any claimed contest of the movant's version of the facts and (2) any additional facts that the nonmovant chooses to assert. In this instance Frigo's response is cited "P. 12(n)."

6. Frigo cites "Ex. 6, p. 41" for that proposition. In fact, however, his Mem. 1 identifies only four exhibits (all denoted by letters, A–D) as attached. It seems most likely that a "C" (the exhibit that contains excerpts from Stevens' deposition) was mistakenly transcribed as a "6." But in all events pages 41 and 42 of that deposition simply refer to "the pre-arranged arrest signal" as having been "activated," without Stevens specifically attributing the activation to anyone.

7. There were a number of other respects in which Frigo's testimony (as reflected by a number of his answers at Dep. 157–65) did not bear out the allegations in his Complaint. Defendants' Mem. 1 n. 1 "invite[s]" this Court to order Frigo and his attorney "to show cause why they have not violated Rule 11(b)(3) by making factual contentions without evidentiary support." This opinion has not embarked on that detour at this stage of the proceedings.

8. Frigo Mem. 4 basically admits as much by referring only to Stevens' testimony:

> The only basis on which Sgt. Stevens concluded [he] had probable cause to arrest John Frigo was that he had been told that Unzueta took the blue gym bag from Mr. Frigo's car, and sit [sic] was later found to contain the money offered by Unzueta to officer Guerra. (Ex. C. p. 39–47).

As *United States v. Valencia,* 913 F.2d 378, 382 (7th Cir.1990) has put the matter:

> Probable cause involves a practical, common sense determination about whether, given all the circumstances present, it is reasonably probable that a person has committed or is committing an offense.

It must be concluded, then, that Stevens had probable cause to arrest Frigo (even with all of the latter's testimony credited, as it must be). That determination is wholly independent of Frigo's flight from the area of the drug bust. Even though such flight might ordinarily be considered as self-incriminating and as providing the probable cause needed for a legitimate arrest in its own right, this opinion does not rest on that footing because Frigo testified that his run was provoked by Stevens' plain-clothes-gun-toting conduct (despite Stevens' denial of that version).[9]

That latter asserted action on Stevens' part does raise another potential Fourth Amendment issue, even though Frigo has not addressed the matter in that sense. Frigo has argued only that his flight was triggered by the fact that someone (with no indication that the someone was a law enforcement officer) pointed a gun at him while he was sitting in his car at the side of the road (Dep. 109–19). But even though he has not framed the matter in these added terms, it is also true that the fact that the alleged gun-pointer ultimately turned out to be a "state actor" arguably raises the legal question whether that claimed action itself constitutes a Fourth Amendment "seizure."

█ In that respect the seminal decision in *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968) has said:

> Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.

And though the statement of the relevant standard has led to sharp differences in its application, there is no question that the standard itself is whether under all the circumstances a reasonable person would have felt free to terminate the encounter (*Florida v. Bostick,* 501 U.S. 429, 439–40, 111 S.Ct. 2382, 2389, 115 L.Ed.2d 389 (1991)).[10]

Frigo demonstrated in the most graphic way—by actually fleeing—that he indeed felt free to "terminate the encounter" in a sense. But that does not necessarily mean that a reasonable person would have felt similarly unconstrained by a gun pointed in his or her direction from an adjacent automobile. If Frigo's reaction were not that of the presumed reasonable person, Stevens' conduct would have amounted to a seizure. And that in turn would pose the question whether the seizure was reasonable—this time from the perspective of the actor (Stevens) rather than the perspective of the object of the action (Frigo).

For that purpose it does not matter whether Stevens' claimed pointing of a gun at Frigo is viewed as incident to a full-scale arrest or as part of a so-called investigatory or *Terry* stop. Because the latter category of detention falls short of an all-out arrest, less suspicion is required to justify it (*United States v. Serna–Barreto,* 842 F.2d 965, 966 (7th Cir.1988); accord, *United States v. Perdue,* 8 F.3d 1455, 1463 (10th Cir.1993) ("Although effectuating a *Terry* stop by pointing guns at a suspect may elevate a seizure to an 'arrest' in most scenarios, it was not unreasonable under these circumstances")). *Serna–Barreto,* 842 F.2d at 966–68 held that a police officer's action in ordering a drug suspect out of a parked car at gunpoint was not an arrest but an investigatory stop subject to the lesser standard. If Stevens' alleged seizure were viewed in that light, it would be deemed reasonable so long as it satisfied a standard that *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) articulated as "considerably less than

---

**9.** Relatedly, it has already been stated that this opinion does not credit Stevens' declaration that he had on his wig-wag lights and siren, because it was controverted by Frigo's Dep. 117–18.

**10.** Though the three dissenting Justices in *Bostick* objected vigorously to the majority's affirma-

tive answer to that inquiry in the case under review, they expressly agreed that the question had been appropriately framed in the majority opinion (501 U.S. at 443–44, 111 S.Ct. at 2391).

proof of wrongdoing by a preponderance of the evidence." [11]

But that same conclusion holds true even if Stevens' asserted conduct in pointing the gun at Frigo were characterized as part of a proposed arrest at that moment, thus requiring a heightened level of belief on Stevens' part. This opinion has already held that Stevens had valid grounds for tagging Frigo with participation in a crime in progress— even if such participation were labeled in aiding-and-abetting terms—at the time that the money from the gym bag from the Thunderbird was proffered (thus *People v. Sauer,* 177 Ill.App.3d 870, 876, 127 Ill.Dec. 117, 121–22, 532 N.E.2d 946, 950–51 (2d Dist.1988) upheld conviction of a lookout stationed in an automobile because "it is unnecessary to prove defendant participated in the commission of the act which constituted the offense").

In sum, even if they were stretched to cover a ground that he has not raised, Frigo's probable cause arguments are wholly without merit from any perspective. Stevens cannot be held for any alleged Fourth Amendment violation other than the possible application of excessive force—to which this opinion now turns.

### Excessive Force

 Frigo finally claims that Stevens hit him once in the head with a gun immediately after Frigo stepped out of his car following the chase, after which Stevens kicked Frigo while he lay prone on the ground. Just as was true with the probable-cause-for-arrest analysis, claims that an arresting officer used excessive force are also evaluated in

terms of the Fourth Amendment's prohibition against unreasonable seizures (*Graham,* 490 U.S. at 395, 109 S.Ct. at 1871). While *Graham, id.* at 396, 109 S.Ct. at 1871 recognized that "the right to make an arrest ... necessarily carries with it the right to use some degree of physical coercion ... to effect it," it also teaches that such force cannot be unreasonably excessive.

Frigo's Complaint ¶ 22 originally spoke in terms of a prolonged beating and permanent disfigurement. Even though that version was reined in considerably at Frigo's Dep. 19, 162–63 and 165 (where he said that he was struck in the head once and sustained much less serious injuries), all of that goes to his potentially recoverable damages and not to the existence of a constitutional violation as such. As *Lester v. City of Chicago,* 830 F.2d 706, 712 (7th Cir.1987) teaches:

> The Fourth Amendment protects against unreasonable seizures, not seizures that "shock the conscience" or cause "severe injuries." If, under the totality of circumstances, a police officer unreasonably seizes a person by using excessive force, he has violated that person's Fourth Amendment rights. The objectively unreasonable seizure itself (regardless of the officer's motive or whether any injury inflicted was severe) crosses the constitutional threshold.

And *Hebron v. Touhy,* 18 F.3d 421, 423–24 (7th Cir.1994) has recently reconfirmed that *Lester* 's overruling (830 F.2d at 709–14) of *Gumz v. Morrissette,* 772 F.2d 1395, 1400 (7th Cir.1985) corrected the constitutional error of that case in requiring a showing of severe injury and malice.[12] As for the latter

---

**11.** *United States v. Chaidez,* 919 F.2d 1193, 1199 (7th Cir.1990) has surveyed various standards referred to by the Supreme Court in assessing the quantum of probability necessary to justify a detention (ranging from *Sokolow* 's less-than-preponderance characterization to a more-likely-than-not test implied by some older cases). Ultimately *Chaidez* declined to take any definitive position, stating that the test was not subject to "[s]ound quantification" and should therefore be left "flexible" (*id.*).

**12.** Defendants' Mem. 9 argues (citing only a 1992 district court case from Kansas) that to prevail on his excessive force claim Frigo "must establish that he suffered a significant injury."

That misstatement of the law that this Court must apply is particularly disingenuous, for on the very next page defense counsel actually cites to *Lester* (the very case that repudiated any "significant injury" requirement)—albeit in a somewhat different context—cheek by jowl with counsel's repetition of the supposed significant injury ingredient. Quite apart from the fact that district court decisions (whether from Kansas or from this Court) do not establish precedent even in their own bailiwicks (let alone on foreign soil), it is extraordinarily distressing to encounter such a patent misrepresentation of the law from an experienced representative of the highest legal officer in the state. And that is doubly troublesome when it takes place in an area of the law

component—malice—it too has been supplanted by applying an objective reasonableness standard to an officer's conduct, a standard ratified post-*Lester* by the ultimate authority in *Graham*, 490 U.S. at 397, 109 S.Ct. at 1872 ("the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation").

In those terms it is clear that Frigo's excessive force claim is one that can be properly addressed only by a jury. Frigo says that Stevens clubbed him with a gun and then kicked him (Frigo Dep. 16–20, 77–78). Stevens categorically denies all such allegations. It is simply not possible to reconcile those contradictory accounts without making determinations as to the relative credibility of those witnesses, something that is impermissible for a judge ruling on a Rule 56 motion (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).

Defendants' R.Mem. 6 advances the position that Frigo "makes no argument the totality of the circumstances would not have allowed him to be subdued with a gun to the head." But that variant again asks this Court to decide whether the officer's conduct was "objectively reasonable" in light of all the facts—by its very nature the type of determination that a judge is in no position to undertake on the current motion. This Court must credit Frigo's version for present purposes, and that includes accepting his statement that he was whacked just as he stepped out of the car. Once Frigo abandoned his flight and left the Thunderbird to give himself up, with no show of force on his part, it surely cannot be said as a matter of law that such a degree of officers' force (or perhaps any force at all) was reasonable (cf. *Brownell v. Figel*, 950 F.2d 1285, 1292 (7th Cir.1991), holding that whether a suspect is trying to escape is a relevant factor in assessing whether the force used was excessive).

One final argument offered on Stevens' behalf concerns Frigo's lack of absolute certainty as to the identity of his alleged attacker. Although at one point Frigo says that he did not actually see the person who delivered the blow, there are a number of other places in his deposition testimony from which inferences can reasonably be drawn that Stevens was that culprit (see, e.g., Frigo Dep. 16–21 and 78). And as to the alleged kicking that ensued, Frigo not only identified Stevens as one of those involved (Frigo Dep. 19–20, 78), but in addition Stevens' unquestioned presence on the scene and his status as the officer in charge create a factual matrix for the potential application of cases such as *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir.1972) and *Rascon v. Hardiman*, 803 F.2d 269, 276 (7th Cir.1986)).

Defendants' Mem. 8–9 and R.Mem. 5 paint a misleading picture in urging that it was Frigo's lawyer and not Frigo himself who identified Stevens. Fairly read (indeed, even without the necessary inferences in Frigo's favor), Frigo's testimony is that Frigo described the claimed perpetrator to his lawyer, who in turn informed him that the description matched that of Stevens (Dep. 16, 17–18).

In sum, Frigo has proffered sufficient evidence from which it can reasonably be inferred that Stevens exercised an excessive degree of force in arresting Frigo. That issue must be left to a jury to resolve.

### Conclusion

There is no genuine issue of material fact, and the respective defendants are entitled to a judgment as a matter of law, as to (1) all of Frigo's claims against Guerra and (2) Frigo's claim against Stevens stemming from an asserted lack of probable cause to have arrested Frigo. Consequently Guerra is dismissed as a defendant. But Stevens' motion must be and is denied as to Frigo's excessive force claim, on which this case will go to trial.

that the Attorney General's office must deal with day in and day out.