**CHANDLER NATURAL GAS CORPORATION, Olive Lewellyn and John Lewellyn, Plaintiffs**

v.

**Larry BARR, Jack Pike and W. David Rector, as Commissioners of Warrick County, State of Indiana, Bruce Hargrave, as Sheriff of Warrick County, Indiana, and Shawn Weiss, Individually and as Deputy Sheriff of Warrick County, Indiana, and John Does 1–10, et al., Defendants.**

No. EV 97–9–C–Y/H.

United States District Court,
S.D. Indiana,
Evansville Division.

July 31, 2000.

George Brattain, Day Swango Brattain & Nattkemper, Terre Haute, IN, Jeffery L. Lantz, Lantz Law Office, Evansville, IN, J. Burley Scales, Scales Wissner & Krantz, Boonville, IN, for Chandler Natural Gas Corp., Olive Lewellyn, John Lewellyn.

Terry A. White, Olsen Labhart White & Hambidge, Evansville, IN, Brent R. Weil, David R. Sauvey, Kightlinger & Gray, Evansville, IN, for Larry Barr, Jack Pike, W. David Rector.

Terry A. White, Olsen Labhart White & Hambidge, Evansville, IN, R. Thomas Bodkin, Bamberger Foreman Oswald & Hahn, Evansville, IN, David R Sauvey, Kightlinger & Gray, Evansville, IN, for Bruce Hargrave.

R. Thomas Bodkin, Bamberger Foreman Oswald & Hahn, Evansville, IN, David R Sauvey, Kightlinger & Gray, Evansville, IN, for Shawn Weiss.

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

YOUNG, District Judge.

### I. Introduction

When the driver of a heavy truck approached a county bridge across a small creek in the summer of 1995, he was probably not aware that his decision to cross that bridge would create multiple claims of violations of federal civil rights. But, in fact, his decision to cross that bridge has engendered a very contentious lawsuit on that very subject. The third amended complaint in that suit contains ten "Counts." Many of the counts contain multiple claims. The claims are not well defined, even though this complaint is the third attempt to define them. The motions for summary judgment have not been much better than the complaint, as amended, when it comes to defining the issues. Perhaps this court's efforts will be no better than those of the parties. The court will begin by examining claims brought under 42 U.S.C. § 1983, since that is the ostensible basis for federal jurisdiction. After having concluded whether there are federal claims which survive the motion for summary judgment, this court may be faced with analysis of state law claims. As to whether this court must address those claims, the court will cross that bridge when it comes to it.

### II. Statement of Material Facts

The facts, in the light most favorable to the plaintiffs, are as follows: [1]

1. In the summer of 1995, a county bridge across Pigeon Creek, on Warrick County Road 50 West, also known as Heim Road, collapsed while a heavy truck was crossing it. (Third amended complaint, ¶ 16).

2. Following the collapse, Chandler National Gas ("CNG") was notified pursuant to Indiana statutes and customary operating procedures. (*Id.*, ¶ 17). CNG sent John Lewellyn to the site of the collapsed bridge to observe the removal of the truck. (*Id.*, ¶ 17).

3. At the site, the superintendent of the Warrick County highway department, Gerald Ray Wallace, asked John Lewellyn if CNG had a gas line in the area. (Defendants' exhibit 2, examination in chief of Gerald Ray Wallace, *State v. Lewellyn*, p. 299). John Lewellyn told Warrick County Commissioner Jack Pike, while the two and others, including at times Mr. Wallace, were talking or at least apparently listening, in the neighborhood of the bridge collapse, that "there were no gas lines that we had *in the shoulders of the road*" (plaintiffs' exhibit I (emphasis added), Lewellyn dep. of November 12, 1999, p. 16, line 21, to p. 17, line 1; Plaintiffs' exhibit K, direct examination of Gerald Ray Wallace, p. 6, lines 3–6), and that "I told them to the north, as I pointed, that ... we had a fourinch line" but that he did not know how far north of the bridge the four-inch line was (plaintiffs' exhibit I-2, Lewellyn dep. of November 12, 1999, p. 17, lines 13–24), and that he told Mr. Pike that "the only line we had *in the berm of the road area or near the edge of the road* was quite a ways east of there. I showed him where it stopped and *it was not going to be a factor for the crane.*" (Plaintiffs' Exhibit I-3 (emphasis added), Lewellyn dep. of November 12, 1999, p. 18, lines 3–7).

4. John Lewellyn, at all pertinent times, thought that CNG "had an active gas distribution line in the area of the Heim Road bridge project until the con-

1. The parties have done a good job of complying with Local Rule 56.1. Each has argued how certain portions of deposition or trial testimony should be understood to support their version of the events. Where there are contested versions about what was said or meant in a particular conversation, the court has adopted the plaintiffs' version of events as to that particular conversation or meeting.

trary was discovered during work undertaken after the utility reimbursement agreement was entered into." (Plaintiffs' exhibit U, affidavit of John Lewellyn, ¶ 8.)

5. Pursuant to the provisions of Title 23 of the United States Code, Warrick County arranged for the construction of the new bridge to be 80% funded by federal money (third amended complaint, ¶ 20), and subject to certain federal regulations (defendants' exhibit 7).

6. Rick Bennitt, an engineer with Bernardin, Lochmueller, and Associates, was contacted in late 1995 and put in charge of securing the right-of-way for the construction of the new bridge. As part of an information-gathering exercise for an engineering survey, Bennitt was informed by Texas Gas Company that CNG may have a gas line in the area. (Examination in chief of Richard Bennitt, *State v. Lewellyn*, pp. 342–45). Bennitt then contacted John Lewellyn and "explained to him that we had information that they may have a line on the project and I needed to know where it was, if it was in the way of the project, and we needed to meet so I could give him a set of plans and begin the same process with CNG that I had begun with all the other utilities." (*Id.*, p. 348).

7. Lewellyn told Bennitt on January 17, 1996, that they (CNG) did have a line there. (*Id.*, p. 353).

8. On January 24, 1996, the defendant county commissioners sent a letter to CNG stating that the bridge was being replaced and that CNG "has a gas line that will need moving for the [bridge] project to proceed." The letter also stated that "this project is of an emergency nature and INDOT will administrate the project on an accelerated schedule . . . ." The letter also stated that "the Board of Commissioners respectfully requests your cooperation in keeping this important project moving forward." (Defendants' exhibit 5).

9. Boonville Natural Gas [2] then submitted a preliminary estimate to conduct a study of the cost to vacate property rights that they may have and install a new gas distribution line around the bridge repair project area. (Third amended complaint, ¶ 23). The county commissioners accepted this estimate (but never paid the estimate), and the plaintiffs proceeded to prepare and submit a project cost estimate. (*Id.*, ¶ 24).

10. On March 4, 1996, CNG submitted an estimate for over $32,000 to relocate a four-inch gas line on Heim Road. Based on this estimate, a county utility reimbursement agreement was entered into on March 11, 1996, by Olive Lewellyn, as the president of CNG. (Defendants' exhibits 6, 7).

11. Olive Lewellyn's sole role with respect to the subject matter of this suit is her signing the utility reimbursement agreement on behalf of CNG. There is no evidence that she "negotiated" anything or made any representations to anybody.

12. The purpose of the utility reimbursement agreement was not only to locate CNG's physical gas distribution facilities or pipelines away from the bridge replacement project area, but also for the vacation of its right-of-way. (*See* Plaintiffs' exhibit JJ, John Lewellyn dep. of November 12, 1999, p. 35, line 20, to p. 36, line 20; defendants' exhibit 7, p. 1 (last paragraph)); 23 C.F.R. § 710.304(i)(2) ("[f]ederal funds may participate in the cost of acquisition of non-operating real property of a utility or railroad in the same manner as for other privately owned property.") The utility reimbursement agreement incorporated by reference various federal regulations pertaining to when federal funds may be used to reimburse the taking of a utility's right-of-way. (Defendants' exhibit 7, pp. 1, 2, 4, 5).

---

**2.** Boonville Natural Gas and Chandler Natural Gas are separate corporations which are controlled by the same principals. The court will refer to both corporations as "CNG" for convenience sake.

13. In September 1996, Commissioner Larry Barr received two anonymous calls from a male in the Boonville area. The unidentified caller said that he was concerned that CNG was going to be paid by the county to move a gas line that was not their own. (Barr statement at 1). Barr contacted the Warrick County sheriff's department to report what the caller had told him. (Barr statement at 2).

14. The Warrick County sheriff's department opened an investigation into the matter and Sheriff Hargrave and Chief Deputy Marlin Weisheit assigned Deputy Shawn Weis to the case. (Defendants' exhibit 9). Weis commenced an investigation by contacting employees and business relations of CNG. (Third amended complaint, ¶ 31). Weis learned from CNG employees Robert Gourley, Scott Boatwright and Bob Hildenbrand that the gas line CNG was being paid to replace was actually inactive. (Warrick County case report at 3).

15. During the course of this investigation, Deputy Weis used prosecutor's subpoenas to access certain documents that were relevant to CNG's property holdings near the project area. (Third amended complaint, ¶ 31). Weis obtained a service report from Texas Gas which showed that the only line in the immediate area of the project was "Abandoned in Place." (Defendants' exhibit 10). Weis also obtained documents from Ohio Valley Gas which revealed that they did not have an active line in the area. (Defendants' exhibit 11). Any line CNG had in the area of the bridge was purchased from Ohio Valley Gas in 1991. John Lewellyn was involved in the purchase of the gas line and right-of-way from Ohio Valley Gas. (Defendants' exhibit 21, p. 24).

16. On April 24, 1997, the Warrick County prosecutor's office filed grand jury indictments charging John and Olive Lewellyn with attempted theft. (Defendants' exhibit 13). Warrants were issued for the plaintiffs' arrest.

17. Sheriff Hargrave admitted that "the basis of the allegation" in the indictments was that "they [being the Lewellyns] entered into a contract in [an] attempt to commit theft against the county." He also admitted that he had not read the utility reimbursement agreement and did not know whether anybody in the sheriff's department had read it. (Plaintiffs' exhibit PP, Hargrave dep., p. 23, line 24, to p. 24, line 15). Weis testified that he had reviewed the agreement. (Plaintiffs' exhibit QQ, Weis dep., p. 38, lines 3–6).

18. Sometime during the investigation, Sheriff Hargrave was informed that employees of CNG were working on a gas line on the premises of J & J Powder Coating, a business located near the intersection of Heim Road and State Road 62. (Defendants' exhibit 14, Sheriff Hargrave affidavit, ¶ 4). Sheriff Hargrave had permission to be on the premises of J & J Powder Coating. He observed a CNG truck parked near the area with a rusty pipe in the bed of the truck. Sheriff Hargrave and other officers conducted a videotape surveillance of the service crew. (Third amended complaint, ¶ 36).

19. On October 3, 1997, the plaintiffs received a letter from the Warrick County administrator informing them that, by majority vote of the county commissioners, the bill for the engineering study would not be paid. (Defendants' exhibit 15).

20. On July 2, 1998, the Warrick County prosecutor's office filed a motion to dismiss the indictments. (Defendants' exhibit 16). Deputy Prosecutor David Kelley dismissed the charges just prior to trial because he did not like the wording of the indictment. (Defendants' exhibit 17, David Kelley affidavit, ¶ 8).

21. On November 17, 1998, the charges against the Lewellyns were refiled. (Id., ¶ 9). The decision to dismiss and refile was made solely by the prosecutor's office. (Id., ¶ 8).

22. The case was tried in January 1999 and was dismissed at the close of the state's case for lack of evidence.

23. Plaintiff CNG has prepared but not submitted a request for payment under the utility reimbursement agreement. The reason that the request has not been submitted is because plaintiffs fear that to submit such a claim will cause the defendants to reinitiate criminal charges.

### III. Analysis

Section 1983 of Title 42 of the United States Code provides a vehicle for the enforcement of claims of violation of civil rights. The United States Supreme Court, in *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979), clarified that the statute itself does not provide any substantive rights, but rather serves to ensure that an individual has a cause of action for violations of the Constitution or other federal law. *Id.*, at 617, 99 S.Ct. 1905.

For purposes of the court's analysis, there are three inquiries the court must make. They are:

(1) Did a person acting under color of law

(2) deprive "any citizen of the United States or any person within the jurisdiction thereof"

(3) of any rights, privileges or immunities secured by the Constitution or laws of the United States?

**Inquiry 1: Are the named defendants "persons acting under color of law"?**

■ As to the first element, there appears to be no dispute that Mr. Barr, Mr. Pike and Mr. Rector were persons who were acting as commissioners of Warrick County and were acting under color of law at all times relevant. The introductory paragraph of the third amended complaint

indicates that Barr and Rector are sued as individuals. Barr, Pike and Rector are also sued in their official capacities as county commissioners. Such a suit is a suit against Warrick County. *Brandon v. Holt*, 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). Bruce Hargrave is the sheriff of Warrick County, and Shawn Weis was acting as a deputy sheriff. The suit also implicates these two individuals, and the office of the sheriff of Warrick County, and all are alleged to have taken actions in this case as well. There is no dispute that these defendants were acting under color of law at all times relevant. Therefore, this court must look to see whether

Mr. Barr, individually;

Mr. Rector, individually;

the Warrick County commissioners;

Sheriff Hargrave, individually;

Deputy Weis, individually; and

the office of the Warrick County sheriff [3]

took actions in this case which violated the plaintiffs' civil rights.

**Inquiry 2: Are plaintiffs citizens of the United States or persons within its jurisdiction?**

Clearly, John and Olive Lewellyn are citizens of the United States. CNG is described in paragraph 7 of the third amended complaint as an Indiana corporation. This court has concluded preliminarily that under certain circumstances, corporations can be considered citizens for purposes of the due process clause of the Fourteenth Amendment.[4] That conclusion is subject to being revised in this motion.

**Inquiry 3: Does the third amended complaint allege deprivation of rights, privileges or immunities secured by the Constitution or the laws of the United States?**

■ Because section 1983 "is not itself a source of substantive rights," but merely

---

**3.** This court's order of September 13, 1999, has concluded that Hargrave, as sheriff, is a "person" under § 1983 because he is not a state official in Indiana.

**4.** See this court's order of June 11, 1998.

provides "a method of vindicating federal rights elsewhere conferred," *Baker v. McCollan,* 443 U.S. 137, 144, n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), the first step in any such claim is to identify the specific constitutional right allegedly infringed. *Id.,* at 140, 99 S.Ct. 2689; *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

The third inquiry is the crux of this case. Precisely which of their rights, privileges or immunities do each of these three plaintiffs allege to have been violated and by which defendants? The counts of the third amended complaint which appear to raise claims of "civil rights" violations are denominated as counts II and V.[5] After having examined these counts, this court concludes that the following claims have been alleged in the third amended complaint:

A. Plaintiff CNG has been deprived of:

(1) "just compensation" for any property "taken" by the county as a part of the bridge repair project

 (a) by the actions of Barr, Rector, Hargrave and Weis in their acts of abusing process and coercively threatening, discouraging and prohibiting CNG from claiming compensation (¶¶ 39–41, 49); and

 (b) by the county commissioners' vote to deny payment for work performed by CNG on the project (¶¶ 39–41, 49);

(2) due process before the county commissioners by the county commissioners' vote to deny payment of the invoices (¶¶ 39–41, 49); and

(3) its right "to have the benefit of a contract with an agency or political subdivision of the State of Indiana as guaranteed by the Fifth Amendment to the Constitution" by the actions of Barr, Rector, Hargrave and Weis in threatening and conducting an unwarranted criminal investigation in order to prohibit the plaintiffs from appearing before the commissioners to seek payment of invoices (¶ 48).

B. Plaintiffs John and Olive Lewellyn have been deprived of:

(1) their constitutionally protected interest in their reputations (¶¶ 50, 62) by the actions of Barr, Rector, Hargrave and Weis in threatening and conducting an unwarranted criminal investigation; and

(2) their Fourth Amendment right to be free from unreasonable seizure

 (a) by Barr, Rector, Hargrave and Weis when they were maliciously prosecuted; and

 (b) by Weis when they were the subject of process maliciously issued (¶ 61).[6]

---

**5.** Count III, paragraph 54, mentions the Fifth Amendment, but this count specifically states that the count arises under Indiana law. The court will treat the reference to the Fifth Amendment as superfluous, and duplications of claims found at paragraph 28. Plaintiffs suggest this approach is correct at page 34 of their brief.

Count VIII alleges violations of civil rights, but does not denominate any new or different actions by any defendant from those previously alleged in the complaint. The court will treat this count as a request for exemplary damages only, as the name of the count suggests.

**6.** This paragraph also refers to deprivation of property under the Fifth Amendment. However, all of the payments withheld here are due to the corporate entity CNG. The payments are the only property anyone has been deprived of that is anywhere mentioned in the complaint or briefs. Since this money must be due the corporation, the court will conclude that the Lewellyns themselves do not state a claim for deprivation of this money.

Paragraph 36 of the third amended complaint mentions a "warrantless" search of a truck. However, the paragraphs of the complaint which seek relief do not allege a violation of any right to be free of any unlawful search or seizure that relates to the seizure of corroded pipe from the truck at issue. The plaintiffs dispute facts about whether there was probable cause for the warrantless search. (Brief, p. 6, ¶ 13) and mention in their brief that the warrantless search is part of the pattern of incidents that deterred CNG from submitting a claim. (Brief, p. 31). But

## C. Civil Conspiracy:

Count V of the third amended complaint alleges a conspiracy of the defendants to deprive John and Olive Lewellyn and CNG of their civil rights. This claim will be discussed separately from the other 1983 claims because, as will be explained *infra,* the existence of this claim will depend upon whether other constitutional claims are found to exist.

Having now defined the claimed violations of civil rights alleged in the third amended complaint, several conclusions can be made about these claims.

## A. CNG's Claims

### 1. CNG's claims for "just compensation":

CNG has not been paid for the invoices submitted to Warrick County, and has failed to submit a second claim for payment for fear that the county will prosecute criminal charges if they do so. Does the fact that a county fails to pay an invoice that is submitted to them raise a constitutional claim? The plaintiffs' third amended complaint suggests that the Fifth and Fourteenth Amendments are the sources of any constitutional protection. The plaintiffs do not suggest which portions of the amendments or Supreme Court cases define the "rights, privileges or immunities secured by the Constitution or laws of the United States" that they have been deprived of.

This court's own research of the Fifth Amendment indicates that the most obvious portion of the Fifth Amendment is the so-called "just compensation" clause, which provides:

> ... nor shall private property be taken for public use without just compensation.

■ An early Supreme Court case suggests that the provision applies only to claims against the federal government, *Fallbrook Irrigation District v. Bradley,* 164 U.S. 112, 17 S.Ct. 56, 41 L.Ed. 369 (1896), and an early appellate court decision from this circuit concurred. *See Commissioners of Highways of Towns of Annawan v. United States,* 653 F.2d 292 (1981). However, the Supreme Court has held that the right to just compensation under the Fifth Amendment is made applicable to the states under the Fourteenth Amendment. *Chicago B. & Q. R. Co. v. City of Chicago,* 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897). From this holding, the court will conclude that a proper plaintiff may bring a claim for just compensation against the county under the Fifth and Fourteenth Amendments.

■ Is CNG a "citizen or other person" entitled to act as a plaintiff under § 1983? The case of *Grosjean v. American Press Co.,* 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936), has concluded that only natural persons can be "citizens" of the United States, and that a corporation cannot assert a violation of the privileges and immunities clause of the Fourteenth Amendment. However, in the same case, the Supreme Court concluded that a corporation could be a "person" within the meaning of the "Due Process" clause of the Fourteenth Amendment. Since CNG can be a "person" who cannot be deprived of due process protections; and because the Supreme Court has concluded that the Fourteenth Amendment does make the Fifth Amendment rights to "just compensation" applicable to the states, this court will conclude that CNG, a for-profit corporation, is entitled to bring a claim for denial of property without just compensation.

there is no specific portion of plaintiffs' brief that argues that there is a separate cause of action for damages from the search *itself.* There is no identification of the owner of the truck or the property seized in the record, and without that information, the court questions whether any of the plaintiffs have standing to challenge the search. At this stage of the proceedings, the court concludes that no claim for an "illegal" search is intended to exist by the plaintiffs. They should seek leave to amend the complaint to plead such a claim within ten (10) days of this order if they intend to do so.

Having concluded that CNG can bring such a claim, what must it prove to establish the elements of the claim? There is not a clearly defined answer to this question. Most of the cases which discuss the "just compensation" clause do not have facts which closely parallel those of this case. Most deal with zoning issues or the impact of a regulatory scheme upon a person's ability to make use of property. *See San Diego Gas & Elec. Co. v. City of San Diego,* 450 U.S. 621, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981); *Williamson County Regional Planning Com'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). The fact that none of the primary Supreme Court decisions contain a fact pattern similar to that in the case at bar suggests to this court that the plaintiffs do not have such a claim. There is no "regulatory" taking here at issue—no implementation of any zoning law or county ordinance that deprives CNG of the use of its property.

The cases which do interpret the Fifth Amendment's "just compensation" claims first begin their analysis by determining if there has been a "taking" by the government. In this case, as the result of a bridge collapse, the county has asked CNG to move some underground gas lines and to vacate utility easements. To be sure, there is a dispute as to whether some or all of those gas lines were active; but, there is no dispute that CNG performed some work to move their property at the county's request. The record is not clear precisely what property was moved, nor is it clear whether the new bridge caused CNG to abandon or lose easements over which they had the right to operate in the future. In the light most favorable to the non-moving party, this court would conclude that CNG has expended labor and funds to move and replace some of its property and has lost some use of an easement in the area of the bridge replacement project. This being the case, it may be concluded that Warrick County has "taken" CNG's property as that term is commonly understood.

Moreover, Warrick County has apparently refused to approve, by vote of its commissioners, to authorize payment for $2,800 expended on the engineering study (finding of fact 19) and for a time at least threatened they would not pay the amount due to purchase easements owned by CNG, and to pay the cost of the work CNG performed as they promised to do under the county utility reimbursement agreement. Therefore, under the facts in this case, this court would conclude that there has been a "taking" under the Fifth Amendment. Albeit this taking is not the sort of taking most discussed in Supreme Court cases which interpret this clause, there is nevertheless here a refusal of the county to make payment which amounts to a regulatory taking of easements on real property. Though finding that a cause of action exists, it must be pointed out that it is far from certain that the county's actions fall within prior Supreme Court jurisprudence on the just compensation clause.

Was the taking without just compensation? *Williamson County Regional Planning Com'n,* 473 U.S. at 186, 105 S.Ct. 3108, raises an important point in this regard:

> [A] claim that the application of government regulations effects a taking of property interest is not ripe until the governmental entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.

It is not completely clear from the facts of this case that Warrick County has finally decided not to make payment of all the funds. Nor is there any indication that the amount of payment due under the contract will not be "just compensation" if it is paid. However, in *First English Evangelical Lutheran Church v. Los Angeles County,* 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), the Supreme Court held that damages may be proper under the just compensation clause even for

"temporary takings." In this case, the county's failure to vote to pay this claim for a period now over four years suggests that there may be a claim viable for at least the temporary failure to pay for the work performed. There is one final vote to deny payment for the engineering study. There has been a taking.

■ But even if CNG does have a potential claim for a "taking," there remains a final barrier to its cause of action here. It is now well-settled that if a state provides procedures for seeking just compensation, a property owner cannot bring a claim under the Fifth Amendment until he/she has used these procedures and been denied just compensation. *Williamson County Regional Planning Com'n*, 473 U.S. at 195, 105 S.Ct. 3108; *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 533–34, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) (claim that municipal ordinance as applied effected regulatory taking would be unripe if claimant had not sought state redress); *DeHart v. Town of Austin*, 39 F.3d 718, 724 (7th Cir.1994); *River Park, Inc. v. City of Highland Park*, 23 F.3d 164, 167 (7th Cir.1994); *Estate of Himelstein v. City of Fort Wayne, Ind.*, 898 F.2d 573, 575–578 (7th Cir.1990) (property owner's takings claim for city council's failure to issue building permit after property had allegedly been rezoned not ripe for review where owner had not brought inverse condemnation action in state court and not shown state inverse condemnation procedure was unavailable or inadequate). Though often referred to as a ripeness rule, the requirement is predicated on the language of the Fifth Amendment itself, which only proscribes takings "without just compensation" and hence plaintiff must first seek, and then be denied, compensation under state procedures before a constitutional violation occurs. *See, e.g., Gamble v. Eau Claire County*, 5 F.3d 285, 286 (7th Cir.1993) ("a landowner cannot complain that his constitutional right [to just compensation for a taking] has been denied until he exhausts his remedies for obtaining a compensation award or equivalent relief from the state"). Because the plaintiffs have not yet filed a state law inverse condemnation claim, this court must dismiss their Fifth Amendment takings claim without prejudice as unripe at least as to a claim for payment of an easement. *E.g., Himelstein*, 898 F.2d at 578.

There is a portion of the claim in which plaintiffs allege they have not been paid for services performed. It is less clear whether the failure to pay for services performed is a "taking" under the Fourteenth Amendment. This court will conclude that to the extent there has been a failure to pay money to CNG under a contractual agreement, such a claim should be cognizable under a denial of due process analysis, and not under the "takings" clause of the Fifth Amendment. The analysis of the denial of due process claim will be considered in the next portion of this analysis.

## 2. CNG's claim for denial of a due process hearing before the commissioners:

Plaintiff CNG argues that it has been denied its rights under the Fifth and Fourteenth Amendments to a "due process hearing" before the county commissioners. (Third amended complaint, ¶ 48). The concept of whether there has been a due process violation is a particularly difficult legal concept.

This opinion has previously concluded that CNG is an "other person" within the meaning of the due process clause of the Fourteenth Amendment, and therefore a proper plaintiff in an allegation of denial of due process under the Fifth Amendment.

The third amended complaint alleges a failure to be given a "due process hearing" by the county commissioners in order to obtain the company's payment. Some

treatises[7] and *First English Evangelical Lutheran Church v. Los Angeles County*, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), suggest that this claim is different from a claim under the "just compensation" clause of the Fifth Amendment, and this court will treat it in keeping with that distinction.

As is now well known, due process has both a procedural and substantive component. Before denial of due process can become the basis of a cause of action under § 1983, a life, liberty or property interest must be identified. Here, the third amended complaint alleges that CNG has been deprived of the payment of money for services performed for the county. Does every failure to pay by a county require a due process hearing?

As to procedural due process claims, two Supreme Court cases that discuss this question most clearly are *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), and *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). In *Parratt*, the Supreme Court concluded that a hobby kit owned by a prisoner was property subject to the due process clause of the Fourteenth Amendment. The loss of this property, however, was determined not to be a deprivation of property "without due process of law," because the state offered post-deprivation remedies in the form of its tort claims laws to enable the plaintiff to recover damages for his loss. The *Parratt* court cited to an earlier decision in *Phillips v. Commissioner of Internal Revenue*, 283 U.S. 589, 596–97, 51 S.Ct. 608, 75 L.Ed. 1289 (1931), that states:

> Where only property rights are involved, mere postponement of the judicial inquiry is not a denial of due process, if the opportunity given for ultimate judicial determination of liability is adequate.

*Parratt* further states that "some kind of hearing is required at some time before a State *finally* deprives a person of his property interest." *Parratt*, 451 U.S. at 540, 101 S.Ct. 1908 (emphasis added).

In this case, where CNG has only a property interest at issue, if the county has failed to make payment under the contracts to CNG, the state provides its contract law and the civil courts of this state as a manner in which the breach of that agreement can be remedied with a pre-deprivation hearing. The plaintiffs have not suggested, and this court is not aware of, any provision of Indiana contract law which grants immunity to the county from suit for a breach of contract. As such, any delay or failure of the county to pay CNG money would not appear to be denial of property "*without due process*" because there is an adequate post-deprivation remedy available. This court is convinced that § 1983 should not be used to make the Fourteenth Amendment a "font" of contract law anymore than the amendment should be used as a "font" of tort law.

It is tempting to stop at this juncture and conclude that *Parratt* disposes of the plaintiffs' claims here. However, the holding in *Logan* calls into question whether that is the correct outcome. As *Logan* points out, *Parratt* addressed the "random unauthorized act" of a state official which deprived a person of property. The *Logan* court reviewed prior holdings that discuss due process of law and stated:

> To put it as plainly as possible, the State may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim for entitlement.

\* \* \* \* \*

In *Parratt*, the Court emphasized that it was dealing with "a tortious loss of . . . property as a result of a random and unauthorized act by a state employee

7. S. Nahmod, Civil Rights and Civil Liberties Litigation: The Law of Section 1983, Vol. 1, pp. 3–192 (4th ed.).

... not a result of some established state procedure." 451 U.S., at 541, 101 S.Ct., at 1915. Here, in contrast, it is the state system itself that destroys a complainant's property interest, by operation of law, whenever the Commission fails to convene a timely conference—whether the Commission's action is taken through negligence, maliciousness, or otherwise. *Parratt* was not designed to reach such a situation. *See id.*, at 545, 101 S.Ct., at 1918 (second concurring opinion). Unlike the complainant in *Parratt, Logan* is challenging not the Commission's error, but the "established state procedure" that destroys his entitlement without according him proper procedural safeguards.

In any event, the Court's decisions suggest that, absent "the necessity of quick action by the State or the impracticality of providing any pre-deprivation process," a post-deprivation hearing here would be constitutionally inadequate. *Parratt*, 451 U.S., at 539, 101 S.Ct., at 1915. *See Memphis Light, Gas & Water Div. v. Craft*, 436 U.S., at 19–20, 98 S.Ct., at 1565–1566. That is particularly true where, as here, the State's only post-termination process comes in the form of an independent tort action. Seeking redress through a tort suit is apt to be a lengthy and speculative process, which in a situation such as this one will never make the complainant entirely whole. . . .

Obviously, nothing we have said entitles every civil litigant to a hearing on the merits in every case. The State may erect reasonable procedural requirements for triggering the right to an adjudication, be they statutes of limitations, cf. *Chase Securities Corp. v. Donaldson*, 325 U.S., at 314–316, 65 S.Ct., at 1142–1143, or, in an appropriate case, filing fees. *United States v. Kras*, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973). And the State certainly accords due process when it terminates a claim for failure to comply with a reasonable procedural or evidentiary rule.

*Hammond Packing Co. v. Arkansas*, 212 U.S., at 351, 29 S.Ct., at 380; *Windsor v. McVeigh*, 93 U.S., at 278. What the Fourteenth Amendment does require, however, "is 'an opportunity . . . granted at a meaningful time and in a meaningful manner,' *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965) (emphasis added), 'for [a] hearing appropriate to the nature of the case,' *Mullane v. Central Hanover Tr. Co., supra*, 339 U.S., at 313, 70 S.Ct., at 656." *Boddie v. Connecticut*, 401 U.S., at 378, 91 S.Ct., at 786.

*Logan*, 455 U.S. at 434–37, 102 S.Ct. 1148 (citations and footnotes omitted).

The facts of this case position it somewhere in the middle of *Parratt* and *Logan*. Plaintiffs are alleging that they are being deprived of payment of their invoices by the actions of state actors threatening criminal prosecution if CNG submits its claims for payment—a necessary prerequisite for payment by the county. As such, the state actors are not depriving CNG of due process by some "random, unauthorized act," but neither are they depriving CNG of its property by the implementation of some state "statutory scheme" which "by operation of law" destroys CNG's property right.

■ As *Logan* suggests, a person is denied due process if they are denied "an opportunity to be heard," granted "at a meaningful time," and "in a meaningful manner." *Logan*, 455 U.S. at 437, 102 S.Ct. 1148. Facts in the light most favorable to CNG show that they were not given an opportunity to be heard before their claim for payment for the engineering study was denied by the county, and CNG's claim for payment under the utility reimbursement agreement has been delayed, at least temporarily, by the threat of criminal prosecution.

Because the actions of the county are not really "random and unauthorized," nor are they taken where there is a necessity

of quick action by the county; nor was it impractical to provide any predeprivation process, this court will conclude that the case before us fits closer to the *Logan* analysis than the *Parratt* analysis. Therefore, this court concludes that CNG does have a cause of action for denial of its property without procedural due process of law.

█ Against which defendants does this claim lie? Because the county has failed to make payment, the claim lies against the county. But the law is far from clear that the actions taken violate the due process clause. Therefore, all defendants sued in their individual capacities are entitled to qualified immunity under this claim. The office of the sheriff will also remain a defendant in this claim, as the actions taken to initiate investigations were done at the direction of the sheriff and as an official act of that office. If those actions are found to have been a cause of a deprivation in this case, the office of the sheriff may be liable.

█ Having concluded that CNG's complaint does contain a viable denial of a procedural due process claim, does it also include a claim for denial of substitutive due process? In order for the actions of a defendant to violate substantive due process principles, those actions must *"shock the conscience."* *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). This concept was originally found in cases where state officials use excessive force. *See, for example, Lester v. City of Chicago,* 830 F.2d 706 (7th Cir.1987), but was replaced by a different standard in *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). It was sometimes discussed in wrongful confinement or creation of danger cases such as *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Some malicious prosecution claims have been made the basis of substantive due process claims, but in this case, CNG, the corporation, has not been prosecuted. This court can find no case in which the mere failure to pay an invoice

for services performed has been construed to be a violation of substantive due process, or has otherwise been construed to be conduct that shocks the conscience. Therefore, this court will conclude that CNG has no substantive due process claim in this case.

3. **CNG's right to have the benefit of a contract with an agency or political subdivision of the state of Indiana is guaranteed by the Fifth Amendment:**

This issue is framed by language found at paragraph 48 of the third amended complaint. Does the Fifth Amendment grant to corporations some right to contract with a political subdivision of the state of Indiana. This court cannot find anything in the language of the Fifth Amendment itself to suggest that there is any such right. There is a line of cases from the Supreme Court beginning with *Dennis v. Higgins,* 498 U.S. 439, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991), which suggests that § 1983 may serve as a vehicle to bring claims against states that enact barriers against interstate commerce. Challenges of this nature are said to arise under the so-called "dormant commerce clause." But the cases which are brought under this theory generally challenge the enactment of taxes or regulatory schemes which have an impact upon foreign businesses which seek to operate within a state different from that of their domicile. *See, for example, Pioneer Military Lending, Inc. v. Manning,* 2 F.3d 280 (8th Cir.1993). While there are cases which challenge actions taken by county government, these cases deal with instances of conduct where a county has attempted to enact ordinances which proscribed bringing waste generated outside a county from being brought into a county. *See BFI Medical Waste Systems v. Whatcom County,* 983 F.2d 911 (9th Cir.1993).

█ The facts in this case simply do not seem to fit within this theory because

the actions of the county in failing to pay CNG's invoices do not have a significant impact on interstate commerce. CNG is an Indiana corporation which is a public utility authorized to provide gas service in the Warrick County area. (Third amended complaint, ¶¶ 13–14). There is no allegation that the pipes that were replaced were a part of some major interstate gas transmission pipeline; nor that service to CNG customers outside the state of Indiana has been disrupted; nor that the failure to pay these invoices has caused the utility as a whole to disrupt services to a large number of its customers. This court will conclude that the failure to pay an invoice of $2,800 for an engineering study, and actions taken by the county to inhibit the payment of approximately $32,000 to re-route a small portion of a natural gas transmission service do not sufficiently affect interstate commerce to call into question whether Warrick County's actions impermissibly impact the "dormant commerce" clause. The fact that federal funds pay for some portion of the bridge replacement project also does not, in and of itself, suggest that interstate commerce is significantly impacted. The court, therefore, concludes that CNG does not have a cause of action under 42 U.S.C. § 1983 to enforce any contract with Warrick County.

## Conclusions as to plaintiff CNG:

Plaintiff CNG has one claim yet to be resolved in this case. CNG has a claim against the county and the office of the sheriff for a denial of procedural due process of law. No other causes of action remain viable against any other defendants because: first, all of the defendants in their individual capacities are entitled to qualified immunity from liability for these claims which exist, but are not clearly established; and secondly, because the facts of this case do not support any other theories pled. Therefore, all other claims by CNG are DISMISSED except for the one listed above.

## B. John and Olive Lewellyn's Claims

### 1. The claims of John and Olive Lewellyn as to damages to their reputations:

We turn now to the claims of John and Olive Lewellyn that their reputations have been damaged as found at paragraph 50 of their third amended complaint. The case which most directly addresses this case is *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). In that case, a plaintiff sought to recover for damage to his reputation when his name and picture were placed on a flyer of "active shoplifters" distributed by police officers to about 800 merchants in the Louisville, Kentucky area. At the time of the distribution of the flyer, the plaintiff had been arrested and charged, but not convicted, of shoplifting. The plaintiff alleged that the distribution of the flyer damaged his reputation and violated two provisions of the Constitution. Specifically he alleged that he was deprived of a "liberty" interest protected by the procedural guarantees of the Fourteenth Amendment; and that these actions violated a "right of privacy" guaranteed under the First, Fourth, Fifth, Ninth and Fourteenth Amendments. The Supreme Court concluded that the plaintiff's theories were not based on rights secured to him under the Fourteenth Amendment, and therefore no actions would be under 42 U.S.C. § 1983.

The logic of *Paul* applies to plaintiffs' claims here as well. The Lewellyns claim damage to their reputations by virtue of an unwarranted decision to prosecute them, and by the public filing of documents accusing them of fraud. (Third amended complaint, ¶ 50). While these actions may support a state action for defamation, they fail to meet one of the criteria stated in *Paul* for a cause of action for a deprivation of a liberty interest. In the *Paul* opinion, the court recognized that in its previous cases, a claim for deprivation of a liberty interest would lie when:

... as a result of the state action complained of, a right or status previously recognized by state law was distinctly altered or extinguished. It was this alteration, officially removing the interest from the recognition and protection previously afforded by the State, which we found sufficient to invoke the procedural guarantees contained in the Due Process Clause of the Fourteenth Amendment. But the interest in reputation alone which respondent seeks to vindicate in this action in federal court is quite different from the "liberty" or "property" recognized in those decisions. Kentucky law does not extend to respondent any legal guarantee of present enjoyment of reputation which has been altered as a result of petitioners' actions. Rather his interest in reputation is simply one of a number which the State may protect against injury by virtue of its tort law, providing a forum for vindication of those interests by means of damages actions. And any harm or injury to that interest, even where as here inflicted by an officer of the State, does not result in a deprivation of any "liberty" or "property" recognized by state or federal law, nor has it worked any change of respondent's status as theretofore recognized under the State's laws. For these reasons we hold that the interest in reputation asserted in this case is neither "liberty" nor "property" guaranteed against state deprivation without due process of law.

*Paul,* 424 U.S. at 711–12, 96 S.Ct. 1155.

Plaintiffs in this case do not allege that they have lost any right or status as the result of the state's decision to prosecute them, or as a result of the public statements or documents attendant to that prosecution. As such, damage to reputation alone does not invoke a claim of constitutional loss.

 As to any right of privacy violated in this case, *Paul* holds that the guarantee of personal privacy protected by the Constitution must be limited to those rights which are "fundamental" or "implicit in the concept of ordered liberty." *Palko v. State of Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937). Activities within the definition include matters relating to marriage, procreation, contraception, family relationships, and the like. *Paul* held that damage by being accused of a crime of which one had not been convicted was *not* within one of these fundamental rights. The facts before this court fare no better. Olive and John Lewellyn do not have a claim for damage to their reputations based upon constitutional principles.

2. **John and Olive Lewellyn's claim of violation of their Fourteenth Amendment rights to be free from unreasonable seizure in the form of malicious prosecution:**

We begin the analysis of John and Olive Lewellyn's claim that they have the constitutional right to be free from malicious prosecution with the case of *Albright v. Oliver,* 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). In that case, plurality and concurring opinions agreed that such a fact scenario must be analyzed under the Fourteenth Amendment and not under principles of substantive due process. The *Albright* case has generated much discussion because its various opinions do not give concrete holdings which enable lower courts to know exactly how to resolve claims of malicious prosecution brought under § 1983.

 The Seventh Circuit began its post-*Albright* jurisprudence in *Garcia v. City of Chicago,* 24 F.3d 966 (7th Cir.1994); *Smart v. Board of Trustees of University of Illinois,* 34 F.3d 432, 434 (7th Cir.1994); and *Reed v. City of Chicago,* 77 F.3d 1049 (7th Cir.1996). The elements of a claim for malicious prosecution under 42 U.S.C. § 1983 are:

(1) plaintiff must satisfy the requirements of a state law cause of action for malicious prosecution;

(2) the malicious prosecution must be committed by state actors; and

(3) plaintiff must have been deprived of liberty.

Under Indiana law, four elements must be shown to exist to establish such a claim, according to *Conwell v. Beatty,* 667 N.E.2d 768, 778 (Ind.Ct.App.1996). They are:

(1) that defendants instituted or caused to be instituted a prosecution against the plaintiff;

(2) that defendants acted maliciously in doing so;

(3) that the prosecution was instituted without probable cause; and

(4) that the prosecution terminated in plaintiff's favor.

The defendants' motion for summary judgment challenges one element of the claim. Defendants argue that because a grand jury indicted the Lewellyns, the prosecution was made with probable cause.

■ While a grand jury in Indiana does issue an indictment based on probable cause, this court does not believe that the issuance of an indictment forecloses any other inquiry into probable cause. In the classic case of malicious prosecution, a police officer or prosecutor can present known false information to a grand jury which results in the issuance of the indictment. The fact that the grand jury indicted does not establish that there has been no malicious prosecution. As the defendants point out, however, under Indiana law a judicial determination is prima facie evidence of probable cause in a criminal case. *Conwell,* 667 N.E.2d at 778.

■ This court concludes that because a grand jury issued an indictment, the defendants have brought forward prima facie evidence of probable cause and that the burden must then shift to the plaintiffs to bring forward some evidence that there was no probable cause, or that at least there are disputed facts which might lead to an inference that there was no probable cause for the prosecution of the plaintiffs.

In this case, the plaintiffs were originally charged with "Attempted Theft" in indictments filed April 24, 1997.

Under the Indiana "Attempt" statute found at I.C. 35–41–5–1, a person attempts to commit a crime when acting with the culpability required for commission of the crime, he engages in conduct that constitutes a substantial step toward the commission of the crime. In this case, in order to determine whether there was probable cause to commit the crime of "Attempted Theft," the state actor would need to have some evidence that John and Olive Lewellyn:

(1) engaged in a substantial step

(2) to knowingly and intentionally exert unauthorized control over

(3) the public monies of Warrick County

(4) with the intent to deprive Warrick County of any part of its value or use.

*See* I.C. 35–43–4–2. There are many disputed facts in this case, but in resolving the disputed instances in the light most favorable to the non-moving party, as viewed by a reasonable police officer, this court believes that there is not probable cause present here that John and Olive Lewellyn committed an attempted theft. The major problem with prosecution in this case is that the invoice submitted to the county for the engineering study, the estimate for the costs of relocating the gas line, and the utility reimbursement agreement submitted to the county are all submitted in the name of a corporate entity. Payment made under either of those invoices would have been made to CNG and not to either John or Olive Lewellyn. Neither could have exerted control, authorized or unauthorized, of the county funds. I.C. 35–41–2–3 provides that a corporation may be prosecuted for an offense of theft. While there may have been probable cause to prosecute the corporation for attempting to commit theft by invoices for work performed by corporate agents for work done to improve the corporate gas line

system that was unnecessary, there is no probable cause to believe John or Olive Lewellyn personally were attempting to exert unauthorized control over Warrick County funds.[8] Therefore, this court must conclude that there is *no* evidence to support a finding of probable cause to prosecute John and Olive Lewellyn.

The second element of the claim which must be established in order to find malicious prosecution is that the defendants acted maliciously in instituting the action. Clearly, a determination about the "motivation" of any actor is often fact-sensitive and can only be found by drawing inferences from the actor's conduct. But under Indiana law, this second element of the claim requires a showing of something more than the mere fact that the prosecution was conducted without probable cause.

■ The court has thoroughly searched the materials brought forward by the plaintiffs in their response to the motion for summary judgment, and in the materials filed in support of the motion. The court can find no hint of malice. There is no dispute about the fact that this incident began with anonymous telephone calls to Commissioner Barr. There is no evidence that Barr falsely claimed to have received those calls, or that Barr had any other ulterior motive to do harm to the Lewellyns or CNG because of some past disagreement. Neither is there any indication that Hargrave or Weis had any previous disagreements with the Lewellyns from which some malice might spring. There is no evidence that either Weis or Hargrave testified falsely before any grand jury or at trial. The case was dismissed because the elements did not amount to a crime. Commissioner Rector is not alleged to have acted with malice. Because there is no evidence of record that establishes "malice" by any defendant, the

plaintiffs' claims under Indiana state law and under 42 U.S.C. § 1983 must fail.

Another constitutional claim which remains to be resolved is whether John and Olive Lewellyn have a claim against any defendant under the Constitution or laws of the United States for "Abuse of Process." The factual basis for this claim is found in findings of fact 15 to 17, where it is alleged that Weis served "prosecutor's subpoenas" upon Texas Gas and Ohio Valley Gas to obtain documents as a part of his investigation.

Defendants argue that there is no abuse of process claim here because the plaintiffs cannot establish that defendants acted in a way that was procedural or substantially improper. (Memorandum in support, p. 13).

■ As this court has previously discussed, the commission of a tort by a state actor is not immediately converted into a claim under 42 U.S.C. § 1983. What must first be identified is a constitutional provision which has been violated. There is no allegation here that any misuse of process against the Lewellyns was motivated by an invidious motive or to prevent or punish political expression. Therefore, there is no violation of equal protection of the laws or of the First Amendment—two portions of the Constitution which often serve as a basis for such a claim under § 1983.

Did Sheriff Hargrave subject the Lewellyns to an unreasonable search and seizure by abusing process? Did Deputy Weis also subject the Lewellyns to unreasonable seizure by his improper use of subpoenas (process)? The answers to these questions appear to depend on the elements necessary to establish an abuse of process under Indiana law.

The Indiana Supreme Court has discussed the tort of abuse of process recently in *National City Bank, Indiana v.*

---

**8.** I.C. 35–41–2–4 provides that a person may be charged with aiding, inducing, or causing an offense. The Lewellyns were never charged with aiding, inducing, or causing an

offense to occur in the materials presented to the court. The second indictment filed in 1998 was not amended to allege any "aiding, inducing, or causing an offense to occur."

*Shortridge,* 689 N.E.2d 1248, 1252 (Ind. 1997), as follows:

> An abuse of process action "requires a finding of misuse or misapplication of process for an end other than that which it was designed to accomplish. The purpose for which the process is used is the only thing of importance." *Display Fixtures Co. v. R.L. Hatcher, Inc.,* 438 N.E.2d 26, 31 (Ind.Ct.App.1982). As the U.S. Supreme Court noted in a case reviewing a claim brought under 42 U.S.C. § 1983 by an Indiana inmate, "The gravamen of [abuse of process] is not the wrongfulness of the prosecution, but some extortionate perversion of lawfully initiated process to illegitimate ends." *Heck v. Humphrey,* 512 U.S. 477, 486 n. 5, 114 S.Ct. 2364, 2372 n. 5, 129 L.Ed.2d 383 (1994).

Later in the case, the court referred to the case of *Wong v. Tabor,* 422 N.E.2d 1279 (Ind.Ct.App.1981), which outlined "a useful analytical structure" for abuse of process claims found in the Restatement of Torts (1977):

> The crux of attorney liability is premised upon a finding that the attorney acted for some purpose other than aiding his client in securing a proper adjudication of his claim. Although "propriety of purpose" is more closely related to the concept of malice than probable cause, we find the Restatement discussion particularly relevant to our present inquiry.
>
> Section 676 of the Restatement provides that "[t]o subject a person to liability for wrongful civil proceedings, the proceedings must have been initiated or continued primarily for a purpose other than that of securing the proper adjudication of the claim on which they are based." ... Therefore, consistent with the perspective that an attorney's ethical and professional obligations to his client are of paramount concern, the Restatement would hold an attorney responsible only where he knowingly initiated proceedings for a clearly improper purpose. This standard contemplates something more on the part of an attorney filing suit than a questionable belief as to the merits of a case, or the failure to fully investigate all the facts prior to initiating suit. As long as grounds exist to support the belief that bringing a particular action may help to secure a proper adjudication of a claim, no liability would adhere under the Restatement to an attorney for wrongful use of civil proceedings.

*National City Bank,* 689 N.E.2d at 1253 (quoting *Wong,* 422 N.E.2d at 1287).

It must be noted, however, that the *National City Bank* court held that an examination of the "motivation" behind the decision to improperly use process is a question of fact that is subject to conflicting inferences, and was not in that case a proper subject for summary judgment.

■ In this case then we must look to determine whether there is evidence that wrongful prosecution by Hargrave was perversely directed to *illegitimate ends.* What are the illegitimate ends which Hargrave sought? There is no evidence before this court that Hargrave, Barr or Rector did anything in this case beyond "failing to investigate all the facts" prior to initiating and continuing the prosecution. As this court previously discussed in the malicious prosecution claim, absent from the case is any evidence that there is some ulterior motive for any of these three to gain revenge against the Lewellyns. Unrebutted evidence is that Barr, a county commissioner, received one or more anonymous calls which suggested that not all of the work being performed on the bridge project was necessary. Upon advice of counsel, Barr referred the matter to the sheriff for an investigation. Weis' actions in using a subpoena to obtain copies of documents is not shown to be motivated by anything other than the request of Texas Gas and Ohio Valley Gas to do so. There is no evidence in this case that any of the four defendants had a "clearly improper purpose" in initiating the criminal prosecu-

tion. To be sure, they may have been overzealous. But being overzealous does not fall within Indiana's definition of abuse of process. The court therefore concludes that John and Olive Lewellyn do not have a cause of action for abuse of process under Indiana law, and because that element is lacking, there is no claim under 42 U.S.C. § 1983 for any violation of a constitutional right based on the commission of a tort under Indiana law.

### C. Count V—Conspiracy

Count V of the plaintiffs' third amended complaint alleges a "Conspiracy in Deprivation of Civil Rights." The pleading alleges that Barr, Hargrave, Rector and Weis conspired and agreed with each other and with other persons to:

(a) maliciously prosecute John and Olive Lewellyn;

(b) abuse process with respect to John and Olive Lewellyn;

(c) deny John and Olive Lewellyn their rights under the Fourth, Fifth and Fourteenth Amendments for just compensation for the taking of their property; and

(d) deny CNG its rights under the Fourth, Fifth and Fourteenth Amendments by taking its property without just compensation.

(*See* third amended complaint, ¶ 61).

The defendants argue that pursuant to *Egan v. Aurora*, 291 F.2d 706 (7th Cir. 1961), "the Civil Rights Act only creates a cause of action for conspiracy to deny equal protection, but not for a conspiracy to deny due process." (Brief at p. 15). Although that might have been the law in 1960, more recent cases suggest that a conspiracy claim can exist under certain circumstances pertinent to this case. In *Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir.1979), the Seventh Circuit Court of Appeals held:

A civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another,' and 'an overt act that results in damage.'" *Rotermund v. United States Steel Corp.*, 474 F.2d 1139 (8th Cir.1973) (citation omitted). In order to prove the existence of a civil conspiracy, a plaintiff is not required to provide direct evidence of the agreement between the conspirators; "(c)ircumstantial evidence may provide adequate proof of conspiracy." *Hoffman–LaRoche, Inc. v. Greenberg*, 447 F.2d 872, 875 (7th Cir.1971). *See also United States v. Varelli*, 407 F.2d 735, 741–42 (7th Cir.1969). Absent the testimony of a coconspirator, it is unlikely that direct evidence of a conspiratorial agreement will exist. Thus, the question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can "infer from the circumstances (that the alleged conspirators) had a 'meeting of the minds' and thus reached an understanding" to achieve the conspiracy's objectives. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970).

*Hampton*, 600 F.2d at 620–21.

In assessing the facts in this case in light of that holding, this court must conclude that there is some evidence of communications between Hargrave, Weis and Barr which resulted in the denial of payments to CNG. CNG has, as previously discussed, been denied its property, at least temporarily, by the prosecution of its principals. The Warrick County commissioners have declined to make payment of at least one invoice after the prosecution began. An inference can exist then that a conspiracy has existed between Hargrave, Weis, Barr and Rector, in their official capacities, which has caused a deprivation of a federal right to CNG. Therefore, the conspiracy count under 42 U.S.C. § 1983

survives against Hargrave, Weis and Warrick County.

Plaintiffs point out (brief, p. 32) that this count also pleads a count for conspiracy under Indiana common law, and defendants' motion for summary judgment argues that this claim must be dismissed. The defendants argue that this claim cannot survive because the underlying torts do not exist. As the court has concluded that the underlying torts of abuse of process and malicious prosecution do not exist here, the court agrees that claims under Indiana's civil conspiracy theory cannot exist. Those claims are hereby **DISMISSED.**

### D. The Remaining State Law Claims

Having concluded that there are claims under 42 U.S.C. § 1983 which survive the defendants' motion for summary judgment, the court will discuss the state law claims.

The court has discussed the "abuse of process" claim under Indiana law as a part of the analysis of the § 1983 claims. That analysis need not be repeated here. For the reasons previously discussed, that claim is **DISMISSED.** Likewise, the court has previously concluded that a malicious prosecution claim under 42 U.S.C. § 1983 or Indiana law does not survive this motion, and it is **DISMISSED.**

While the court has determined that there is no constitutional claim arising out of contract in this case, it is clear that count I of the third amended complaint does seek a declaration of rights under the county utility reimbursement agreement. While certain federal regulations are incorporated into the document, the contract itself provides that it will be construed in accordance with and governed by the laws of the state of Indiana. (*See* section XIII). Therefore, this court will conclude that there remains to be resolved a claim for declaratory judgment under count I of the third amended complaint, and an action for breach of that contract under count III.

Counts VII and IX of the third amended complaint allege claims of "Negligence" which are rather nebulous. However, the defendants' memorandum in support of motion for summary judgment does not address these counts. They, therefore, remain for resolution.

Whether exemplary damages can be awarded under any of the remaining theories is also not briefed, and will be resolved at a later stage of this lawsuit.

### IV. Conclusion

In conclusion, the defendants' motion for summary judgment is **GRANTED, in part,** and **DENIED, in part.** The court concludes that only the following claims under 42 U.S.C. § 1983 survive in this case:

(1) Whether CNG has been deprived of its property without procedural due process of law as required by the Fourteenth Amendment by the actions of Warrick County, and by the actions of Sheriff Hargrave, in his official capacity.

(2) Whether CNG has been the subject of a conspiracy to deny its civil rights by Hargrave and Weis, in their individual and official capacities, and by the Warrick County commissioners, in their official capacities. Under the doctrine of qualified immunity, Hargrave and Weis are immune from damage claims, but may be subject to injunctive relief under this theory.

State law claims remaining to be resolved include:

(3) Negligence claims against Sheriff Hargrave, Deputy Weis and Warrick County as alleged in counts VII and IX of the third amended complaint.

(4) Whether CNG has rights under the county utility reimbursement agreement, and whether that agreement has been breached (counts I and II).

The resolution of these claims will occur at the trial scheduled for September 11, 2000. This is not a final judgment. How-

ever, it would be unfair to defendants to reconsider the malicious prosecution, abuse of process and related constitutional claims at trial based on some newly alleged reason why these defendants acted with malice or for an illegitimate purpose. If the plaintiffs believe that such evidence exists, they must file a more define statement of their claim within thirty (30) days of the date of this order stating with specificity what evidence exists which supports their claims of malice. In the absence of such a filing, the court will not reconsider this issue at trial.